**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
-------------------------------------------------------------x

**HAMID AL RAZAK,**

                       **Petitioner,**

                                                  **Civil Action No.  05 CV 1601**

      **-vs.-**                                           **(GK)**

**GEORGE W. BUSH,**
        **President of the United States,** *et al.,*

                      **Respondents.**

-------------------------------------------------------------x

**PETITIONER'S OPPOSITION TO RESPONDENTS'**
**MOTION FOR AN ORDER TO SHOW CAUSE WHY**
**CASE SHOULD NOT BE DISMISSED FOR LACK OF**
**PROPER "NEXT FRIEND" STANDING AND TO STAY**
**PROCEEDING**

Petitioner HAMID AL RAZAK respectfully opposes Respondents' motion on the ground
that Respondents have affirmatively created the conditions of limited legal recourse which led
Petitioner to take his chosen method of access to this Court. Under these circumstances,
Respondents' motion should be dismissed as their argument of lack of proper standing is akin to
the equitable principle that one cannot seek justice with "unclean hands."  Petitioner further
opposes the motion on the grounds that his chosen method of access to this Court was precisely
in accord with the government's own recommendation to Petitioner and others detained at the
U.S. Naval Base at Guantanamo Bay, subsequent to the Decision handed down by the United
States Supreme Court in *Rasul v. Bush*      U.S.      (2004) Petitioner also requests this Court to
grant Petitioner's counsel immediate access to visit with Petitioner and to require Respondents to
submit a Factual Return and inform counsel of Petitioner's "Enemy Combatant" status.

-1-

## ARGUMENT

1.     **Respondents' Position is Irrational if not Disingenuous and, to the Extent Petitioner's "Next Friend's" Information is Insufficient, it is Due to Respondents' Own Practices and Affirmative Acts.**

Petitioner has been detained and imprisoned by Respondents at the U.S. Naval Base at Guantanamo, Cuba, for an undetermined time, possibly as long as 3 ½ years. He has been held incommunicado, as Respondents have refused to divulge the names of the Guantanamo detainees, their countries of origin, or the names of their relatives. Until commanded by the United States Supreme Court in *Rasul v. Bush*, ___ U.S.___ (2004), Respondents refused to provide Petitioner with counsel, refused to permit him to seek judicial relief on his own behalf, and refused him access to courts via next friend standing. Now that some Guantanamo detainees including Petitioner AL RAZAK are seeking standing in United States Court via "Next Friend" status subsequent to the decision in *Rasul*, Respondents are attacking the validity of even this time-honored method of seeking Wits of *Habeas Corpus,* even though the disadvantages under which Petitioner AL RAZAK labors are obvious.

He is a resident of Afghanistan.

He has had virtually no contact with the news media or any word from outside the closed Guantanamo prison system for over 3 years.

He has had no contact with his friends or family members outside Guantanamo.

He is unfamiliar with the United States Court System.

He does not speak English.

He likely does not know what the term *Habeas Corpus* means.

He has no criminal charges against him.

He has every reason to distrust his captors and keepers.

He has every reason to rely on the friendship with other detainees, who speak his
language and suffer the same disabilities.

He has every reason to challenge his confinement.

No party outside Guantanamo is aware of the specific camp in which he is being
detained, nor the "grade" or "level" of detention he is presumed to be, each
level being determinative of the privileges he receives.

He does not have access to a law library.

He cannot communicate with his attorney, nor does he even know at present that
he has an attorney.

He has no expectation of release, ever.

For Respondents to presume  under these circumstances, all of which were
affirmatively created by them, that Petitioner AL RAZAK, even with a "Next Friend," cannot
under the guidelines of *Whitmore*, lawfully challenge the legality of his confinement, is irrational
at best and more likely disingenuous.  Even those imprisoned in the Tower of London in the 17th
century, for whom the *Habeas* Petition was created as a staple of British Law, had more
conditions in their favor than those oppressing Petitioner AL RAZAK herein.

Indeed, these very conditions led Judge Kollar Kotelly, in a post-*Rasul* decision,
to write:  "The Supreme Court has found that Petitioners have the right to bring their claims
before this Court and finds that Petitioners cannot be expected to exercise this right without the
assistance of counsel."  *Al Odah v. United States*, 346 F. Supp 2d 1, 8 (D.D.C. 2004).

2.    **Petitioner Has In Fact Followed the Procedure Set Forth By Respondents.**

Respondents attached to their Motion a Declaration of Frank Sweigart, (Respondents' "Exhibit B; Petitioner's "Exhibit B" attached hereto.)  In which he explained the "steps taken by the Department of Defense to notify detainees (at Guantanamo) of their right to challenge the legality of their detention by filing *habeas corpus* petitions in Federal Court."  (¶ 2)

Sweigart declares that in December, 2004, "on a rolling basis," Department of Defense began to notify detainees of their right to file a petition.  He further declares that "the notification tells the detainees that they have the option of <u>asking a friend</u>, family member, or lawyer to file a petition on their behalf" (¶ 3, emphasis added), and that they had the option of filing a *pro se* petition as well.  (¶ 3.)  As the Petition of AL RAZAK plainly shows, this is precisely what Petitioner AL RAZAK did - - he asked a friend, in this case fellow detainee AL RAWI, to obtain a lawyer to assert "any legal right he may have."  (See "Exhibit A," attached hereto, which was also "Exhibit A" attached to the Petition)

Attached to the Sweigart Declaration (See "Exhibit B") is a copy of the very "Notification" which he declares was distributed to the Guantanamo detainees.  It states, at paragraph 6:

> You may ask a civilian judge to look into the lawfulness of your detention through a process called a *petition for a writ of habeas corpus*. <u>You may ask a friend</u> or a family member or a lawyer to file such a petition with the court. (emphasis added)

This is precisely what Petitioner AL RAZAK did.

Declarant Sweigart also states that detainees were informed of the willingness of

American Bar Association to recruit volunteer lawyers to represent detainees who desired their services (¶ 7).

This created three (3) possible choices for inmates wishing to avail themselves of a legal challenge to their confinement:

1.   Proceed *pro se;*

2.   File through a "Next Friend"; or

3.   Seek representation through a yet to be instituted plan with the American Bar Association which.

As stated above, Petitioner AL RAZAK took the first option.

The undersigned has attached to this Opposition a sworn Declaration setting forth the steps by which both Petitioner AL RAZAK and his "Next Friend" BISHER AL RAWI came to his attention. (See Declaration of Alan Sussman, attached hereto as "Exhibit C") In brief, AL RAZAK'S fellow detainee, AL RAWI, wrote his (AL RAWI'S) attorney, Clive Stafford Smith, indicating that his friend, AL RAZAK, sought counsel.  AL RAWI wrote that he understands the term "Next Friend" and that he knows AL RAZAK wants a lawyer to assert any legal right that he may have.  In addition, a Declaration of Attorney Smith (Attached hereto as "Exhibit D") indicates that Attorney Smith explained the meaning of "Next Friend" to his clients, including BISHER AL RAWI.

There is no principle of logic which dictates that since some detainees filed *pro se*, and since others may ask the Department of Defense to ask American Bar Association for representation, that those who have filed through a "Next Friend" have or should have any less *bona fide* standing than those who filed *pro se* or by any other method advised or recommended

by Respondents.  Nor does it seem obligatory or even necessary for Petitioner to "demonstrate"

why he has not filed a *pro se* petition on his behalf (suggested in Respondents' Motion, p. 7).

Surely one method is not privileged over another, nor can Petitioner's "failure" to file *pro se*

possibly substantiate any conclusion that he does not desire or is any less desirous of challenging

his detention (possibly for the remainder of his natural life) than those who filed by other

methods.

      The notion set forth both by Declarant Sweigart and by Respondents (p. 9)

that "Department of Defense will soon be delivering a notification to these detainees to advise

them of the American Bar Association's offer to secure them legal representation" is astonishing

in the context of the motion under review today.  It is astonishing because it suggests that the

detainee would (or should) be more willing to accept the offer of legal recourse made not only <u>by</u>

his captors and keepers than that of outside counsel (in this case attorney Clive Stafford Smith,

who has a "track record" with other detainees) but that, if accepted, the detainee will notify his

need for counsel not directly to the American Bar Association but directly <u>to</u> his captors and

keepers.

      The Great Writ, after all, does not act upon the prisoner who seeks relief, but upon

the person who holds him in what is alleged to be unlawful custody.  *Braden v. 30th Judicial*

*Circuit Court of Kentucky*, 410 U.S. 484, 495 (1973), cited by Justice Stevens for the Court in

*Rasul v. Bush,*    U.S.   at    (2004).  While the issue in *Rasul* was the offshore residence of the

Petitioner, the point is that the thrust of a *Habeas* challenge is that it places a  burden upon the

keeper of detainee to justify the detention rather than upon the detainee to justify his <u>desire</u> to

challenge his detention.

3.    **Undersigned Counsel Requests Permission to Speak Personally With Petitioner and Be Informed of Petitioner's Status**.

All issues raised by Respondents could be quickly and properly resolved by allowing the undersigned to visit with Petitioner AL RAZAK in Guantanamo to determine if he wishes to pursue this proceeding or not, and by requiring Respondents to Answer or file a Factual Return to the Petition and inform counsel of Petitioner's status as an "Enemy Combatant."

The Amended Protective Order regarding access to inmates at Guantanamo No. 02-CV-0299 (D.D.C. Nov. 8, 2004) permits counsel two visits with the detainee to ascertain if the inmate truly seeks legal representation. Surely this "two visit" standard is premised on the concept that only a serious, face-to-face visit, repeated after an interval, can determine, under the severe circumstances present, whether legal representation is desired.

If this request requires the Court to order Respondents to expedite the security clearance application of the undersigned, it is respectfully requested that the Court do so.

4.    **Respondents' Motion For a Stay should be Denied.**

Respondents have requested the Court to stay the proceedings in this case pending resolution of the appeals in Kalid, Broumedine, and In re Guantanamo Detainee Cases. In none of these cases would the issues involved therein be frustrated by a denial of the present motion and direct access to Guantanamo to confer with AL RAZAK. On the other hand, were a stay to be granted, AL RAZAK'S legal challenge would be frustrated and needlessly delayed. If, as set forth above, AL RAZAK in two interviews with the undersigned makes it known that he wishes no legal representation or other legal representation, the undersigned will inform this Court and Respondents. Under the best of circumstances, this fettered procedure will take considerable

time. Respondents wish to have it take even longer.

## CONCLUSION

Petitioner respectfully requests that Respondents' motion to show cause be denied, that BISHER AL RAWI be permitted to act at Petitioner's "Next Friend", and that undersigned counsel be afforded the opportunity to travel to Guantanamo to meet with Petitioner AL RAZAK and confirm that he wishes to challenge his detention.

Further, Petitioner respectfully requests that Respondents' request to stay proceedings be denied and that Respondents be required to Anser or file a Factual Return to his Petition and inform counsel of Petitioner's status as an "Enemy Combatant".

For all the foregoing reasons, Respondents' motion to show cause and stay should be denied.

Dated: Bearsville, New York
          September 9, 2005

Respectfully submitted,

Alan N. Sussman, Esq.
SUSSMAN OFFICE
Post Office Box 379
Bearsville, New York 12409
Tel/Fax: (845) 679-6927
Email: sussman@bard.edu

By: _____
ALAN N. SUSSMAN, ESQ.

*Of Counsel*
Barbara Olshansky (NY0057)
CENTER FOR CONSTITUTIONAL
RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
Tel: (212) 614-6439
Fax: (212) 614-6499

-8-

### Certificate of Service

I hereby certify that a true and correct copy of the foregoing instrument has been served by Certified Mail, Return Receipt Requested, to the following persons:

Preeya Noronha, U.S. Attorney
**United States Department of Justice**
Civil Division, Federal Programs Branch
Room 7144
20 Massachusetts Ave, NW
Washington, D.C. 20530

Alberto R. Gonzales
**Attorney General of United States**
U.S. Department of Justice
Robert F. Kennedy Building, Room 5111
**Tenth Street & Constitution Ave, NW**
Washington, D.C. 20530

On this the _9th_ day of September, 2005.

ALAN N. SUSSMAN, ESQ.

-9-

**<u>EXHIBIT A</u>**

# Exhibit "A"

I, BISHER AL RAWI, UNDERSTAND THE TERM "NEXT FRIEND" AND I KNOW THAT

HAMID ALLAH MOWLONI SAEDARA SAED ABD AL RAZAK (ISN 1119)                    (PASHTU)

WANTS LEGAL REPRESENTATION. HE HAS ASKED FOR A LAWYER, AND I ALSO KNOW THAT HE WOULD WANT ME TO ASSERT ANY LEGAL RIGHT HE MAY HAVE. I THEREFORE ACT AS HIS NEXT FRIEND AND ASK CLIVE STAFFORD SMITH TO GET HIM LEGAL REPRESENTATION.

DATED 2ND MAY, 2005.

BISHER AL RAWI

WITNESS

UNCLASSIFIED        FOUO

-11-

**<u>EXHIBIT B</u>**

## DECLARATION OF FRANK SWEIGART

I, Frank Sweigart, pursuant to 28 U.S.C. § 1746, hereby declare and say as follows:

1. I am the Deputy Director of the Office for the Administrative **Review of the Detention** of Enemy Combatants (OARDEC) at U.S. Naval Base Guantanamo Bay, **Cuba. I have been in** this position since June 2004. In this role I assist OARDEC's Director with all aspects of the mission of OARDEC, which is to conduct Combatant Status Review Tribunals (CSRTs) and Administrative Review Boards (ARBs). The purpose of the CSRTs is to review relevant and reasonably available information in the government's possession and conduct hearings on detainees under the control of the Department of Defense (DoD) at U.S. Naval Base Guantanamo Bay, Cuba, and to determine whether a detainee continues to meet the criteria for designation as an enemy combatant. The purpose of the ARBs is to review all relevant and reasonably available information on enemy combatants, conduct hearings, and make a recommendation to the Designated Civilian Official, currently the Secretary of the Navy, on whether an enemy combatant should continue to be detained because he is a threat to the United States or its allies or there are other factors bearing upon the need for continued detention such as law enforcement interest or intelligence value.

2. This declaration is provided to explain the steps taken by the Department of Defense (DoD) to notify the detainees at U.S. Naval Base Guantanamo Bay, Cuba, of their right to challenge the legality of their detention by filing *habeas corpus* petitions in federal court. I make **these statements ba..ed** upon my personal knowledge and upon information made available to me **in the performance** of my official duties.

3. In December 2004 DoD began, on a rolling basis, to notify detainees who had been confirmed to be enemy combatants through the CSRT process that: the CSRT confirmed them to

be enemy combatants; they were now eligible for consideration by an ARB to determine **if they still pose a threat to the United States** or its allies; and they could file a petition for writ of *habeas corpus* in federal court if they wanted to challenge the lawfulness of their detention. **The notification tells the detainees** that they have the option of asking a friend, family member, or **lawyer to file a petition** on their behalf. They are also provided with the address of the United States District Court for the District of Columbia in the event that they choose to submit a *pro se habeas* petition. *See* Exhibit A. CSRT proceedings concluded in March 2005. **Every detainee** confirmed to be an enemy combatant through the CSRT process and who is eligible for consideration by an ARB has received the notice described above.

    4. There are presently 14 detainees not eligible for consideration by an ARB because the President of the United States ordered them triable by Military Commission under the **Military** Order of November 13, 2001. Each of the 14 detainees has been **informed that the CSRT** determined him to be an enemy combatant and that **he can challenge the lawfulness of his** detention by filing a petition for a writ of *habeas corpus* **in federal** court if **he wants to do so.** **These detainees** likewise have been provided with the address of the United States District Court **for the District of Columbia.** *See* Exhibit B.

    5. **DoD has also** notified each detainee whom the CSRT has determined to no longer be an enemy combatant that he can file a petition for writ of *habeas corpus* in federal court if he wants to challenge the lawfulness of his detention. These detainees likewise have been provided with the address of the United States District Court for the District of Columbia. *See* Exhibit C.

    6. DoD is aware of 55 *pro se* petitions written by detainees or, in the case of illiterate detainees, dictated by detainees to an Assisting Military Officer involved in the ARB process.

2

All of these *pro se* petitions were processed pursuant to the military's standard review procedures for outgoing detainee mail, *see* Declaration of 1LT Wade M. Brown, executed March 17, 2005 (attached hereto as Exhibit D), and were mailed to the District Court.

7. As a result of discussions between DoD and the American Bar Association (ABA), the ABA has agreed to recruit volunteer counsel for *pro se* petitioners and other detainees who may desire representation. DoD is preparing to deliver, within the next few weeks, and on an ongoing basis thereafter, to all *pro se* petitioners who are not already represented by counsel, and to other detainees who request the assistance of counsel, a notification which advises them that the ABA is willing to find them a lawyer to assist them with a petition for writ of *habeas corpus*. The notification provides them with the address of the ABA and a form requesting representation that they may complete and mail to the ABA in the event that they choose to seek the assistance of counsel. *See* Exhibit E.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 31, 2005.

FRANK SWEIGART
Deputy Director
OARDEC

3

## NOTIFICATIONS

1. A Combatant Status Review Tribunal (CSRT) has determined that you are an enemy combatant. Because you are an enemy combatant, the United States may continue to detain you.

2. An Administrative Review Board (ARB) will now be held to determine whether you still pose a threat to the United States or its allies. The ARB will consider all relevant and reasonably available information. If the ARB decides you no longer pose a threat, you may be released from detention.

3. You may attend the ARB proceeding and present information about yourself to ARB members. If you believe you do not pose a threat to the United States or its allies, we recommend you immediately gather any information that you believe will prove that you are no longer a threat and why you should be released from detention.

4. The ARB will consider written statements from family members or other persons who can explain why you are no longer a threat. You may also present a written or oral statement at the ARB. Unlike the CSRT, witnesses are not allowed to testify during the ARB. An American officer (called an Assisting Military Officer) will help you prepare your case if you want him to. You do not have to attend the ARB, and you do not have to say anything if you do attend. The ARB will be conducted whether or not you choose to attend.

5. In addition, you have been notified that you may challenge your detention in a United States court. The following procedures are available if you want to challenge your detention in a U.S. court.

*exactly so*

6. You may ask a civilian judge to look at the lawfulness of your detention through a process called a *petition for a writ of habeas corpus*. You may ask a friend or family member or a lawyer to file such a petition with the court. If you do not have a lawyer or a family member or friend who could file this petition for you, you may file your own petition. According to prior court rulings, petitions may be sent to:

*no mother / to depth of friendship of a prisoner*

United States District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, DC 20001

If you do not wish to file a petition, you do not have to do so. However, a court will only consider your case if you file a petition.

7. Please talk to your Assisting Military Officer if you have any questions about this notification. Your assigned Assisting Military Officer will meet with you later.

Detainee ISN: _____    Date: _____

Signature of Officer Serving Notice: _____

Printed Name of Officer Serving Notice: _____

# EXHIBIT A

-17-

**EXHIBIT C**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

-----------------------------------------------------------------x

**HAMID AL RAZAK,**

                       **Petitioner,**

   **-vs.-**                                    **05-CV 1601**

                                               **(GK)**

**GEORGE W. BUSH,**

       **President of the United States,** *et al.,*

                     **Respondents.**

-----------------------------------------------------------------x

## DECLARATION OF ALAN N. SUSSMAN

Declarant, ALAN N. SUSSMAN, comes now upon penalty of perjury and declares that

the following is true and correct to the best of his knowledge, recollection and belief:

1.      I am an attorney duly licences to practice law in the State of New York, the Northern District of New York, the Second Circuit Court of Appeals and the Supreme Court of the United States.

2.      I make this Declaration in support of Petitioner's Opposition to Defendants' Motion to Show Cause why the case should not be dismissed for lack of "Next Friend" standing.

3.      I am co-counsel with The Center for Constitutional Rights, 660 Broadway, New York, New York, in the representation of Petitioner, HAMID AL RAZAK.

4.      Upon information and belief, attorney Clive Stafford Smith is also, and has been for some time, co-counsel with The Center for Constitutional Rights.  On further information and belief, Clive Stafford Smith has visited the Guantanamo center a number of times and represents a number of detainees in Guantanamo, including one BISHER AL RAWI, the "Next Friend" of Petitioner in the case under review today.(See Declaration of Clive Stafford Smith, attached here to as "Exhibit D")

5.      Declarant Smith states that detainees at Guantanamo, due to their physical circumstances, are unable to have lawyers act as their "Next Friend" and that asking a family member to be "Next Friend" might put family members in danger in their foreign country of residence, ("Exhibit D", ¶ 74).

6.      Declarant Smith further states that a number of his Guantanamo clients wished to act as "Next Friends" for other prisoners with whom they have become friendly while in detention.  (¶ 75)  He further states: "I have carefully instructed them on the meaning of next friend in the U.S. legal context and I have asked them to be sure that the prisoners for whom they act desire legal assistance."  (¶ 75)

7.      On 2 May, 2005, BISHER AL RAWI, one of Declarant Smith's clients, wrote Attorney Smith a letter from Guantanamo, stating that he is acting as the "Next Friend" of HAMID AL RAZAK in asking Attorney Smith to obtain legal representation for AL RAZAK. (See "Exhibit A" attached hereto, which also constituted "Exhibit A" to AL RAZAK'S Petition). Petitioner's "Next Friend" in this case, BISHER AL RAWI, further states in his letter to Attorney Smith, "I, Bisher Al Rawi, understand the term "Next Friend" and I know that Hamid... Al Razak (ISN 1119) (PASHTU) wants legal representation.  He has asked for a lawyer and I know that he would want me to assert any legal right that he may have.  I therefore act as his next friend and ask Clive Stafford Smith to get him legal representation." (Exhibit A")

8.      On or about June, 2005, I telephoned the Center for Constitutional Rights, a civil rights legal organization to which I have made financial contributions for years, especially since I learned of its pioneering work in seeking legal representation of the Guantanamo inmates, to volunteer my legal services in this very endeavor.  I was informed that I could do so, and I attended two information and training sessions in New York and Washington in July and August, 2005, for this purpose.  In August, 2005, I entered into a co-counsel agreement with the Center for Constitutional Rights and was given a letter from Bisher Al Rawi to co-counsel Smith, which is the same letter attached hereto as "Exhibit A."

9.      On August 13, 2005, I filed a Petition for a Writ of *Habeas Corpus* for Petitioner HAMID AL RAZAK, via the avenue of "Next Friend" BISHER AL RAWI, attaching his letter as "Exhibit A" to the said Petition.

10.     Subsequent to filing the *Habeas* Petition for AL RAZAK, I contacted the Department of Justice for an application for security clearance to enable me to visit Guantanamo

to visit personally with Petitioner.  Said application was completed and transmitted to the Department of Justice on August 30, 2005.

11.     I have not yet received security clearance and was told by the security officer at Department of Justice that I could expect an 8 to 10 week processing period, which in my case means that clearance could not occur until approximately November, 2005.  I am further advised that proposed visits to Guantanamo require a 20 day prior Notice, thus making my first visit to personally interview my client improbable until late November at best.

12.     No factual Return or Answer has been submitted by Respondents.

13.     No Protective Order has been entered in this case and I am unable at present to enter into attorney-client correspondence with Petitioner AL RAZAK.

14.     I am thus considerably handicapped in providing this Court with first-hand information about the personal desires of Petitioner AL RAZAK but, until then, for the foregoing reasons, I have no reason to doubt his desire for legal representation, expressed through the letter of this Next Friend, nor do I have any reason to doubt that the Next Friend does not have the actual legal interests of Petitioner in mind.

FURTHER DECLARANT SAYETH NOT.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 9 September, 2005

ALAN N. SUSSMAN

-21-

-23-

**<u>EXHIBIT D</u>**

LONDON, ENGLAND

## DECLARATION OF CLIVE A. STAFFORD SMITH

COMES NOW, CLIVE A. STAFFORD SMITH, being sworn, and hereby state as follows:

1. I am a member of the bars of Georgia, **Louisiana**, and Mississippi, as well as of the United States Supreme Court and various among the lower federal courts.

2. I make this declaration concerning the plight of the prisoners in Guantanamo Bay, and the problems that they face in obtaining meaningful access to courts.

3. Everything I write in this affidavit is unclassified or not subject to the classification procedure.

4. Respondents in these cases have recently filed to dismiss the habeas cases brought by various prisoners by next friends. *Respondents' Motion for Order to show Cause why Case should not be Dismissed for Lack of Proper 'Next Friend' Standing or in the Alternative, to stay proceedings pending related Appeals and for Continued Coordination* (hereafter 'Respondent's Motion').

5. The next friends who are challenged are identified as Omar Deghayes, Jamal Kiyemba, Shaker Aamer, Bisher al Rawi, Usama abu Kabir, former detainee Moazzam Begg, all of whom are my clients. The only one who is not is the "one unnamed detainee." *Respondent' Motion, at 4.*

6. The list of cases are as follows:

| Number | Petitioner | Next Friend Petitioner |
|---|---|---|
| 05-CV-1458(ESH) | Ahmed Doe | Omar Deghayes |
| 05-CV-1497(RCL) | Adil bin Muhammed al Wirghi | Moazzam Begg |
| 05-CV-1504(RMC) | Nabil | Jamal Kiyemba |
| 05-CV-1505(RMC) | Abbar Sufian al Hawary | |
| 05-CV-1506(RMC) | Shafiq | Jamal Kiyemba |
| 05-CV-1601(GK) | Hamid al Razak | Bisher al Rawi |
| 05-CV-1635(PLF) | Mohammed Akhtiar | 'Unnamed Detainee' |
| 05-CV-1704(JR) | Sadar Doe | Usama Abu Kabir |

7. Respondents' position is difficult to accept for a number of reasons.

## Guantanamo Bay: The Background

8.  I first became involved in the representation (or attempted representation) of the prisoners in Guantanamo Bay in early 2002, because I believed strongly that this nation fails in its most profound promise when it holds prisoners beyond the rule of law.

9.  The prisoners are cut off from the world to an extraordinary degree.  The isolation of the prisoners has been a cause of huge concern for families of missing persons across the world, as not everyone there is able to send or receive mail.  Some family members do not know today – more than three years later – that their loved ones are in Guantanamo Bay.  Indeed, one of my clients, who was apparently just fourteen at the time that he was seized in Pakistan, has never received any letter from his family in Saudi Arabia and still does not know whether his family know that he is alive.

10. The fact that family members do not know who is truly in Guantanamo Bay is entirely the fault of Respondents.  Like most of the problems faced by all parties to this process, this could be solved by the simple expedient of publishing the names and 'Internment Serial Numbers' (ISN's) of all prisoners.  This, Respondents have steadfastly refused to do.

### The Extremely Difficult Challenge of Providing Prisoners with a Channel for their Legal Rights

11.  After initially bringing litigation on behalf of two British nationals and one Australian, the small group of lawyers involved in this litigation were joined by the twelve Kuwaitis, whose families got together to hire Shearman & Sterling.  From the beginning, the U.S. military frustrated every effort to let the prisoners know their rights.  For example, we asked the U.S. military to consent to merely informing the clients that they were represented in court, but Respondents refused even this meager measure.  I learned from one of my British clients upon his release that they did not learn that they were represented for many months.

12. Our small group of lawyers was just that – very small.  Our resources were very limited.  For example, I was working full time as director of a capital trial office, with a full docket of capital cases.

### Because the Military would not even Reveal the names of those being held in Guantanamo, trying to identify the Prisoners who wanted legal assistance was a monumental task

13. The U.S. Military has thrown roadblocks in the way all along.  To begin with, the government would not allow any lawyers to represent anyone.  Thus, we had to begin by filing suit in the *Rasul* case, on February 19, 2002.  It took almost two and a half years before the Supreme Court recognized the legal rights of the prisoners on June 28, 2004.

14. However, the first problem in bringing a challenge to the lack of access to courts in Guantanamo Bay was that the U.S. military kept the identities of the prisoners

2

secret, so we had to work out who was there. To this day, the military has never made known the names of the prisoners on Guantanamo Bay.

15. I have conducted a project over more than three years merely to identify the names of the prisoners in Guantanamo. This was like completing a very complicated jigsaw. There have been over 750 prisoners from roughly 50 countries, who speak many languages. The only way that their names would come to light was if the home country published a list of their prisoners (provided presumably to the home government by the U.S.), or as the names would leak into the press from the families of the prisoners.

16. Only a small minority of the prisoners (fewer than one percent, all now released) were nationals of European countries. More than 99% were from roughly 40 other countries scattered around the world.

17. Most of these names came out in Arabic media, which made the work of identifying them that much harder   Often the name was misspelled in the Arabic newspaper to begin with, and then transliterated into English in a number of different ways. Thus, the task of sorting out the names of the prisoners was very difficult.  Also, many foreign media outlets are not available on the internet.

18. Even today, more than three years after we began, it has been impossible to get an accurate number even of the nationalities of the prisoners, let alone their names. As of August 31, 2005, our best estimates of the numbers of prisoners who were from each country:

| Country | | Approx. Number of Prisoners |
|---|---|---|
| Afghanistan | | 88 |
| Algeria | | 29 |
| Australia | | 2 |
| Azerbaijan | | 1 |
| Bahrain | | 6 |
| Bangladesh | | 2 |
| Belgium | | 3 |
| Bosnia | | 8 |
| Britain | | 9 |
| Canada | | 2 |
| Chad | | 2 |
| Chechnya | | 2 |
| Denmark | | 1 |
| Egypt | | 16 |
| Ethiopia | | 1 |
| France | | 12 |
| Georgia | | 2 |
| Germany | | 1 |

3

| Iran | 2 |
|---|---|
| Iraq | 2 |
| Jordan | 10 |
| Kazakhstan | - |
| Kenya | 1 |
| Kuwait | 12 |
| Libya | 19 |
| Maldives | 1 |
| Mauritania | 3 |
| Morocco | 34 |
| Pakistan | 65 |
| Palestine | 5 |
| Qatar | 2 |
| Russia | 9 |
| Saudi Arabia | 170 |
| Somalia | 1 |
| Spain | 1 |
| Sudan | 15 |
| Sweden | 1 |
| Syria | 10 |
| Tajikistan | 4 |
| Tunisia | 17 |
| Turkestan | 26 |
| Turkey | 17 |
| Uganda | 1 |
| Uzbekistan | 7 |
| Yemen | 147 |

19. I would not pretend that these estimates are accurate. For example, I believe the total number of Yemenis is lower than 147, and the Saudi figure should be fewer than 170. The higher number is a result of duplication on my list because of different names being used, as well as confusion over true nationality. At the same time, I believe there should be at least 22 more Afghanis. However, there could be a simple solution to our dilemma, if only Respondents would provide us with a complete list of detainees. This, they have refused to do.

20. However, the list (and the fact that the prisoners come from at least 45 countries) does reflect the enormity of the task we have faced.

21. This was slow work. As of June 2004, when the Supreme Court ruled, I had identified fewer than one third of the prisoners being held in Guantanamo Bay, and the names that I had for some of these prisoners were very questionable. Having the names was only the first step. Very rarely did the media identify any way to contact the family

4

or friends of a prisoner, and tracking them down in a country such as Yemen was never going to be easy if we were operating from the United States.

### Rules imposed by Respondents that Made Identification Much Harder

22. Respondents suggest that demanding a more rigorous relationship between the prisoner and the next friend "would diminish the identification issues that have plagued the parties in the Guantanamo detainee litigation thus far." *Respondents' Motion, at 14.* This is simply not the cause of our problems. One of the main causes has been Respondents' refusal to identify the names which they believe are the correct names of the prisoners. If they gave us a list, we could easily review it with our clients in Guantanamo Bay and identify the names of petitioners according to information known to Respondents.

23. Rather, the U.S. military acted as if the names of the prisoners was a classified secret. We have no idea what Respondents' list might look like. However, we do know that, after three years, Respondents have not even been able to identify the ages of many of the prisoners, let alone their proper names. Arabic and Muslim culture encourages the use of nicknames -- for example, the father of Imran may be called Abu Imran. One of my clients is known by at least six names, which are innocuous nicknames, rather than some kind of alias.

24. Thus, the problems involved in making an identification must be put down, in part at least, to Respondents' own inability to identify with any specificity who they actually have in custody.

25. Respondents say that they have yet to identify two dozen petitioners, *Respondents' Motion, at 14,* and that there have been two counsel who went all the way to Guantanamo only to learn that Respondents had incorrectly identified their petitioners. *Respondents' Motion, at 14.*

26. The fault, here, does not lie with Petitioners' counsel but with Respondents' rules. The only consistent method of identification was the ISN. However, the process of identifying people has been made radically more difficult by the fact, despite constant requests for a change in policy, Respondents deemed the ISN to be classified FOUO ('For Official Use Only') until July 7, 2005.[1] This meant that we could not ask our clients for the ISN and then put it in a central list of all the prisoners to crosscheck it. Each time I would get an authorization from a prisoner, I had to edit the ISN out before I could remove it from the secure facility and provide it to counsel for filing a petition.

---

[1] See *E-mail of Andrew Warden* (July 7, 2005) ("After further consultation on the subject, the Department of Defense has determined for the purposes of this habeas litigation only that the pairing of a detainee's name and the 3, 4, or 5-digit ISN for the detainee is no longer classified or subject to treatment as protected information under the applicable protective orders.").

5

**The U.S. Military has not given accurate information
about prisoners even to the governments of our closest allies**

27. The inaccuracy of Respondents' own data would seem to also be the cause of the misinformation that Respondents have given to other governments about the prisoners in Guantanamo bay. For example, based on what the U.S. has told them, the British government maintains to this day that there are only five British residents in Guantanamo Bay – Shaker Aamer, Jamil al Banna, Bisher al Rawi, Omar Deghayes and Jamal Kiyemba. I represent them all, and relied for a long time on the British government's assertion that these were the sum total.

28. That reliance was misplaced. There are many other British residents among the prisoners, including Binyam Mohammed, Ahmed Errachidi, Abdulnour Sameur, Ahmed Ben Bacha, and apparently others who I have not yet confirmed.

29. The tragic case of Binyam Mohammed illustrates how hard it has been to secure authorizations from family members, based on the misinformation spread abroad by Respondents. Mr. Mohammed was a resident of the U.K., who had applied for political asylum from Ethiopia. His siblings all received asylum from the U.S., and are now U.S. nationals. Yet the British government did not know that he was in Guantanamo.

30. When he went missing from the world, his older brother and sister worked tirelessly to try to find him. They wanted to locate him and, had they known he was in prison, they would definitely have wanted to get him legal counsel. However, an FBI Agent actively misled them, telling them that Binyam was not in US custody and that the US did not know where he was. This was false, as he had been rendered from Pakistan to Morocco in a US plane, where he underwent 18 months of horrendous abuse. Meanwhile, his brother traveled to England to try to find him. His sister distributed his picture as far afield as Pakistan, to no avail. He was 'missing' for more than two years, and they did not even learn he was in Guantanamo Bay until 2005.

31. Mr. Mohammed himself, when he finally reached Guantanamo Bay about a year ago, tried all kinds of ways to get counsel. He asked other prisoners who had friends to ask them to contact lawyers. He got my address from another prisoner, and wrote to me – but it took months for the letter to get through. In the meantime, he also asked one of my clients to act as his next friend, and this is how I came to take up his case.

32. Mr. Mohammed is an educated person, who speaks English fluently, and who has even lived in the United States. Despite this, he found it impossible to achieve any meaningful access to the courts before a petition was filed for him by the next friend process.

33. The fact that it proved so difficult to identify, locate and help an educated prisoner from England merely illustrates the immensity of the task when it comes to other countries.

6

-30-

**Identifying the Family members was even more difficult**

34. If it was difficult to identify prisoners names, it was even more difficult to identify and contact the families. While the media might identify the names of some prisoners, very rarely did the media identify family members. Part of the reason for this was the reticence among family members to be identified publicly.

35. The problems for families contacting us were profound. First, they had to have a means to do so, and the internet is not readily available to many people in a country such as Yemen. If they did, they would need to know that help was available, and we did not have a website that would have told them this. Then they would still need to have the capacity to do a search in English to have any chance of finding one of our team.

36. Indeed, I did not begin to receive an appreciable number of contacts from family members until recently, after I had done some media with Al Jazeera to try to raise the profile of the issues. Even so, I have received fewer than ten direct contacts from family members in the past year, without traveling abroad to try to find them.

**Initially, the only way to make legal assistance available was to travel to Foreign Countries to Secure Authorizations to Represent Prisoners**

37. Respondents suggest that using 'friends' of the prisoners at Guantanamo is unnecessary because there are other ways to achieve the same ends. 135 detainees have filed petitions through family members. *Respondents' Motion, at 13* (citing 5 such examples). The implication that this is a reasonable and simple way to get authorizations for petitions is hard to swallow. This is not like a next friend petition in the United States, where the family member is generally in the jurisdiction, and almost invariably within the United States. These family members were spread over 50 countries.

38. The only realistic way to secure authorization from family members was to travel to their countries to secure it. Respondents actually accuse volunteer counsel for the prisoners of "improperly abusing the next friend device in order merely to solicit the Guantanamo detainee population for clients. . . ." *Respondents' Motion, at 14 n.11.* To be accused of 'soliciting' clients – presumably with overtones of ethical impropriety -- is rather difficult to accept. Those of us who have been primarily responsible for securing authorizations from prisoners mainly work with two charities – my own, and the *Center for Constitutional Rights.* The other lawyers involved are working *pro bono* at great expense to themselves.

39. In reality, no matter how we have gone about trying to help these prisoners, we have been seeking out clients – for the very reason that the clients could not seek us out, since they were held effectively incommunicado in Guantanamo Bay.

7

-31-

40. From April 2002 until February 2004 we found it very difficult to find 'next friends' for other prisoners who needed representation. I have spoken to various released prisoners about their view back then, and all of them would have wanted counsel, but felt unable to secure legal assistance. Thus, the fact that we were unable to locate next friends who could authorize our representation of those on the inside prejudiced the prisoners' reasonable wishes.

41. On the outside, very few people had the resources or the knowledge to contact American lawyers to represent the person they wanted to help. This was not from the prisoners spurning the need for assistance, but because they had no way to contact lawyers, or even get their someone else to do so, given the heavy censorship of the mail

42. Given the lack of resources in our group, and perhaps a reasonable reticence on the part of some to travel to countries that had become increasingly hostile to the United States, I became the *only* volunteer to travel around seeking out the prisoners' family members and friends, and asking whether they wanted legal assistance.

43. To this day I have never located a friend or family member of a prisoner in Guantanamo Bay who did not want legal assistance for the prisoner, although some people have been intimidated, thinking that they would incur the wrath of their home governments if they were seen to be working with a foreign lawyer. Many were incredulous that American lawyers would agree to provide this assistance without payment, and had to be convinced that we were for real.

44. My first foreign trip (other than to Britain) was to Paris around Christmas 2003. Through this, and other efforts, we were able to make contact with some of the French prisoners' families. They had French lawyers, making the task easier. I had to pay for this trip with no realistic hope of reimbursement from any U.S. government source.

45. The Europeans constituted a small number of the prisoners, roughly twenty-two out of several hundred prisoners.

46. Once we moved beyond Europe, the problem got much more difficult. There was the sheer size of the problem -- there were reportedly about 350 prisoners from Afghanistan, Saudi Arabia, and Yemen combined, and large numbers from various other countries outside Europe. Some of the traveling to find 'next friends' became significantly more difficult, as some countries would not allow me to go there to find the prisoners' families. Some of the travel was potentially dangerous, and the U.S. State Department would not recommend that U.S. citizens travel to some countries

47. I went to Sana'a, the capital of Yemen, in April 2004. Yemen is not a small country, and it is very poor. We were in the capital, Sana'a, and prisoners' families were spread over the entire country. I had been warned prior to leaving that it could be dangerous to leave the capital and travel around the country. I would have been willing

8

-32-

to risk it, but I had no way of knowing where the families and friends of the prisoners might be located.

48. The 'next friends' had to come to Sana'a. Given the obstacles, I was glad that 'next friends' for 31 prisoners came to the hotel where I was staying, or provided authorizations to a local human rights group. However, we estimated that there were over one hundred Yemeni prisoners at that time.

49. While I was in Yemen, I met with six lawyers from Saudi Arabia, headed by Ahmad Maszar. They were designated as the committee assigned to help the Saudi prisoners in Guantanamo Bay. In fact they obstructed us from assisting the prisoners, and have to this day provided no meaningful assistance to the prisoners. I impressed upon Mr. Mazhar that it was very important to let the friends and families of the prisoners know that we could provide free legal assistance to them. I asked Mr. Mazhar if he could arrange a visa for me to come to Saudi Arabia to meet with family members. I said that I would come there at no cost to them, and find lawyers in the U.S. who would represent the prisoners at no cost. I said that alternatively the Saudi government could follow the lead of the Kuwaitis, and pay for a firm they trusted in the U.S. The Saudi government had hired a firm (McKenna) to file an amicus brief in the U.S. Supreme Court, and I hoped that they might be willing to retain McKenna or another firm this time as well. He promised to consult back in Saudi and get back in touch with me. I continually tried to contact him over this, and met with a McKenna lawyer, trying to get the prisoners representation, with no success.

50. As of June 28, 2004, when the Supreme Court ruled in *Rasul*, my records reflect that we had authorizations for 45 'new' prisoners beyond those involved in the *Rasul* litigation: two of the remaining British nationals and two British refugees, three French, one Turkish resident of Germany, one Canadian, one Australian, one Syrian, three Algerians (who I had contacted through the Canadian wife of one of the Algerian prisoners), and 31 Yemenis.

51. In July 2004, I then went to Bahrain. Again, I had to find funding for this trip since there was no chance that the U.S. government would assist in this effort. With the help of local Human Rights advocates, and the father of one of the Kuwaiti prisoners, in the week I was there, we secured 33 authorizations. These come from Bahrain (6), Jordan (3), Libya (2), Qatar (1), Saudi Arabia (19), Syria (1) and Yemen (1). This was an enormous amount of work. Again, we had to get information into the local media that I had come to Bahrain who could provide help to the prisoners, so that the friends and families would come to meet with me. I had to meet with various Bahraini government officials to ensure that the work would not be curtailed by the government. Most difficult of all was winning the trust of the prisoners' friends and families, as they were naturally suspicious of my motives, after years of the prisoners being held effectively incommunicado.

52. Yet so desperate are people to help the prisoners in Guantanamo that nineteen Saudis crossed the border into Bahrain, and two other people who wanted to help

9

prisoners flew in from Qatar and the United Arab Emirates when they heard on al Jazeera of the efforts we were making.

53. On this trip, I also prevailed upon Mr. Mazhar to come to Bahrain so that I could continue in my efforts to persuade him, as the representative of the Saudi government, to cooperate in our efforts, at least by letting me come to Saudi and meet with people in the government and those who might be concerned about the prisoners. We talked some more about them helping, but ultimately nothing came of it.

54. It was made clear to me that there was no point my even trying to come to Saudi without the cooperation of Mr. Mazhar's group. I also learned that the families and friends of Saudi prisoners were being reassured that they did not need to do anything on behalf of the prisoners because Mr. Mazhar's committee was taking care of it. This actively prevented the Saudi prisoners from getting meaningful representation.

55. In late August, my wife and I moved from Louisiana to London, which did not allow for much travel for a while.

56. I next went to Jordan in October, 2004. I had some concerns about going there because of its reputation as a repressive society. This was to prove prescient. When I arrived in Jordan, as usual I spoke with the media in order to get the word out to families and friends of the prisoners that I was there to offer help, since this was the only realistic way of making contact with the prisoners' families and friends. I mentioned that there was a dispute concerning the number of Jordanians in Guantanamo Bay, because my information indicated that there might be as many as 30. Some of these might be Palestinians, many of whom live in Jordan rather than the West Bank.

57. When this appeared in the Jordanian media, I had an Arabic translator who was kindly helping me without charging me anything, and we had given out her contact details in the media. She received a hostile call from someone purporting to be with Jordanian Secret Service. The person who called her gave an apparently false name (Abu Mataz) and a telephone number. "Abu Mataz" started demanding what she was doing with me, and made various scandalous and false accusations against her and me. He demanded that we appear at the Secret Police headquarters as 6pm that evening. Before going, I asked an associate to seek consular assistance if I have not returned in two hours.

58. The translator came with me. When we told the taxi driver where we were to go, he was very nervous and refused to take us the whole way. We had to walk the last part of the way, towards a well-defended building that housed the Secret Police. We were led into the white building, along a lengthy white corridor, with sporadic closed doors. It was nighttime, and totally silent. I will admit to being rather intimidated at this point.

59. We were taken into a room with two men. I introduced myself, and asked their names. One of them, apparently the most senior, said rather melodramatically that they did not use names in this building.

10

-34-

60. So I wrote a description of him during the meeting. He was about 45-50, short, balding, reddish hair, and wore a very large watch. He did not speak much English, apparently, though he appeared to understand a fair amount. I later described him to a local lawyer, who immediately identified him as Colonel Ali Borjak, who is Director of the Terrorism Department of the Jordanian Intelligence Service. I was told that he is notorious – rightly or wrongly – for having tortured Al Zarkawi when the latter was held in Jordanian custody.

61. Col. Borjak demanded to know why I had said in the newspaper that there were 30 Jordanians in Guantanamo. We had a discussion about this, and he seemed not to believe that I would have come that distance to offer free legal assistance to these prisoners.

62. I told him that the Jordanian government was morally obligated to help me find the families and friends of the prisoners so that I could help them. Col. Borjak said that they did not know where most of the families are. This seemed improbable, given that he worked for the intelligence service, but I was in a quandary since the worst thing that could happen would be having the Jordanian Secret Police show up on the families' doorstep and terrifying them out of working with me.

63. The translator and I later talked to our local contacts, and they said that my American passport would be protection against anything serious happening. Nonetheless, this was a serious event that emphasized the problems we faced trying to help prisoners who come from a repressive state like this. On that trip, for all this trouble and expense, I was eventually able to secure authorizations for only two additional Jordanians, although I also met with representatives of the three who had contacted me when I was in Bahrain.

64. When it comes to interference by foreign governments with our efforts to offer help to the families and friends of prisoners, Jordan is by no means the worst offender. Despite my efforts, I have never even been allowed to visit Saudi Arabia. There are a number of countries that I could not even consider visiting, such as Libya, Syria, Turkmenistan, or Uzbekistan. There are other countries where my presence would almost certainly get the families and friends of Guantanamo prisoners into trouble with the authorities.

65. In between my other responsibilities, these were the only trips that I was able to make up to October. However, all of this travel cost a great deal of money, as well as time. I estimate that it cost more than $5,000 to do this work. Up to November, I was able to secure authorizations for only 66 prisoners from family members, roughly one tenth of those in Guantanamo Bay at the time. At this rate, ensuring that all the prisoners had meaningful access to counsel was going to be prohibitively expensive, and unacceptably slow. There had to be another, more efficient way to get the prisoners the legal assistance that they so badly wanted.

11

**Ultimately, it became possible to cut out the need for International**
**Travel and Secure Authorizations from Guantanamo Bay**

66. In November, I was first able to visit two clients in Guantanamo Bay. This was a great relief, because it opened up a new avenue for helping the prisoners get counsel. If my clients chose to, they could speak with other prisoners, and have these prisoners write out requests for counsel. For those of my clients who asked about how they could help their fellow prisoners, I provided them with a form along the lines of. *Attachment B* (I wrote out the actual version for them during a legal visit).

67. However, this proved ineffective. One client I had at the time wanted to get help for other prisoners, but he was not well educated, and found it hard to understand how to go about it. We also had to contend with the unacceptable legal mail system from Guantanamo Bay. I have my clients keep logs of the letters that they send me, and the ones they receive from me. The system has improved somewhat in terms of my mail to my clients – some months ago, they rarely got my letters, but now they seem to get them more regularly – but it has not improved in terms of the letters they send to me. Via this method, I only received four signed requests for counsel, and those did not come through the mail to me from my client until *May 29, 2005*, months after he had sent them, and months after that client had been released to freedom in the U.K.

**The Next Friend Petitioners relied on**
**the Representations or Promises Made by the U.S.**

68. Thus, by early 2005, there were still very few prisoners for whom there was authorization to file a petition, although I talked to my clients and learned that many were desperate to secure help. We had to search for a more reasonable way to deliver this assistance.

69. One of my clients showed me the English-language version of the Enemy Combatant Notice (ECN) that he had been given by the U.S. military. This gave us the idea of the way in which those of my clients could act as next friends for the other prisoners, thereby helping the other prisoners get the legal assistance they so desperately wanted.

70. To set this in context, the Center for Constitutional Rights (CCR) had been working to persuade the Military to agree to circulate a meaningful notice to the prisoners that would inform them that they could have lawyers, and that the lawyers would cost nothing.

71. The Military would not agree to this, and instead circulated their own ECN. This reads in pertinent part:

> You may ask a civilian judge to look at the lawfulness of
> your detention through a process called a *petition for a writ*
> *of habeas corpus.* You **may ask a friend** or family

12

-36-

member or a lawyer to file such a petition with the court. If
you do not have a lawyer or a family member **or a friend**
who could file this petition for you, you may file your own
petition.

*Attachment C para. 6* (italics in original; bold emphasis supplied).

72. Virtually every prisoner should, at this stage, have been provided with the
information in *Attachment C* in one form or another -- either orally or in writing, either in
English or Arabic, or some other language. I have discussed this document with some of
my clients, and they have understood this to mean that they could file a request for legal
assistance for their friends in Guantanamo Bay.

73. Indeed, under the ECN, the default alternative is to have a friend file a
petition, and only if there is no available friend must the prisoner file a petition on his
own. Therefore, from the prisoners' perspective, this is not an issue of whether another
prisoner may act as 'next friend' -- but simply whether the U.S. Military is going to be
held to its promise.

74. The prisoners certainly have no way of having a lawyer act as next friend and
it is my impression that the prisoners would generally rather have a fellow prisoner as
'next friend' than a family member. For example, Jamal Kiyemba has stated that "[t]he
prisoners want to know why they have to have a family member contacted on this. It's
personal. They think this is just a way of dragging their families into this process, putting
them at risk. This is particularly true when the family is in a repressive society back
home. What is the point of having a family member involved?" *Attachment E, at 9.*

75. Based on this, various of my clients have wanted to act as next friends for
other prisoners with whom they have become friendly while in the prison. I have
carefully instructed them on the legal meaning of next friend in the U.S. legal context and
I have asked them to be sure that the prisoners for whom they act desire legal assistance.
(I refer to these prisoners as 'prisoner next friends.')

76. Even with this effort, we are missing many prisoners who want assistance.

**The special problems of Camp Echo**

77. It is unrealistic -- and, given that Respondents are holding our clients
incommunicado, unreasonable -- for Respondents to pretend that the prisoners can easily
secure the legal assistance they desired.

78. It is not easy for any prisoner to secure help, but it is next to impossible for
some who are held in certain areas. Camp Echo has been one example, and prisoners
there continue to have problems, although it is used now mainly for client legal visits.

13

79. On one of my visits to Guantanamo, at 3:35pm on May 3, 2005, I was at Camp Echo talking to Lt. Col. Lowery when a man who was in the exercise cage shouted to me to ask whether I was a lawyer. Col. Lowery allowed me to speak to him, and he said that he "desperately wants a lawyer". He said he had been in Camp Echo for months and had not been able to get counsel. I had this information unclassified last week, and am providing a statement as the basis for his authorization for filing a petition for a writ of habeas corpus.

### The special problems of Camp V and Level 2, 3 & 4 prisoners

80. The prisoners in Camp V, and those who have been held in restrictive custody of other kinds, face other problems.

81. Camp V prisoners are held in solitary confinement and have nobody who can help them to write documents to counsel. More important, those in Camp V, and those inn restrictive levels, are not allowed pen and paper. Respondents suggest that "Detainees are supplied pens, paper and envelopes regularly. . . ." *Respondents' Motion, at 7 n.4.* For these prisoners, this is just not true, according to the reports of my clients.

82. "[P]articularly with levels 3 & 4 [prisoners], the lack of pen and paper make it very difficult for prisoners to work with counsel." *Attachment E, at 14.* When I met with my prisoners on one visit, the Sergeant at Camp Echo said that the prisoners could not have a pen except when I was present with them. Clearly, it is impossible for prisoners to represent themselves without a pen.

### The numbers reflect that it is extraordinarily difficult to provide the necessary legal assistance to the prisoners without prisoner next friends

83. Getting legal assistance to the prisoners in Guantanamo Bay has been a monumental task.

84. Our clients have provided authorizations for approximately [\*\*\*] prisoners.

85. As a result, we have been able to secure the necessary paperwork to represent [\*\*\*] prisoners, who want legal assistance.

### Military Interference with the Right to Counsel

86. One issue raised by Respondents is whether my clients have a community of interest with the other prisoners such as to justify their acting as 'next friends.' It is very hard to see how any rational person would not want assistance in vindicating his rights. I have talked to a number of prisoners about why some may refuse the assistance of counsel, and it is clear that those few who may make this decision do so because of constant and unconscionable

14

87. It should always be remembered that the Military could easily have solved all of these problems. All the Military had to do was allow an independent person to speak to each prisoner and ask him whether he would like counsel, and we would have secured counsel for everyone who wanted it. Instead, the process of getting the prisoners the help they want has been incredibly convoluted.

88. Far from making counsel available, Respondents have tried to prevent the prisoners from trusting counsel. Some of the prisoners have been manipulated by the Military into thinking that the lawyers are yet another part of the Guantanamo deception. There has been extremely troubling interference with the right to counsel, with the Military discouraging prisoners from attending legal meetings. For example, when I have been to Guantanamo Bay, I meet with prisoners at Camp Echo, which used to be a punitive camp, and continues to be an isolation camp. When there, the prisoners are held in solitary confinement, are not allowed a shower every day, cannot have collective prayer, and are only allowed out briefly once or twice a week. I am required to provide the Military with a schedule for my visits, so the Military are on notice when people need to be there. Yet the prisoners are taken over there long before they are needed. *See Attachment D.* As one prisoner, Jamal Kiyemba, has explained:

> "Camp Echo is the most lonely place on earth. Last time I had a legal visit, I was all alone for ten days. They brought me over there, they would not let me take my Koran, and they put me in an isolation cell with nothing. There is no way to talk to any other prisoner, you're not meant to talk to the guards. There is a camera and microphones in the cell to make sure this is obeyed. The camera seems to shrink the cell, and make you paranoid. * * * There is no communal prayer. Showers and recreation were greatly limited – I got to go into the outside cell once for half an hour in six days, and got one shower. In [Camp] Delta I get outside [e]very day, and have a shower every day. If I complain [about Camp Echo], I am told that it is the lawyer's fault. If I did not have to come for a legal visit, I would not be treated like this."

*See, e.g., Attachment E at 5.*

89. There have also been other consistent and troubling steps taken by the Military to frustrate the right to counsel. I attach a redacted copy of the memo I recently submitted for classification review on "How the Government Engenders a Lack of Trust for Lawyers." *See Attachment E.*

90. On a basic level, the prisoners have a hard time believing that the lawyers are for real because it took almost three years for them to begin to come to the prison. *See, e.g., Attachment E at 4.* How, the prisoners ask, can this be a legitimate legal system if

15

-39-

the lawyers did not come all that time?  It strikes the prisoners as more likely that the lawyers are simply the next devious step in the interrogation system.

91. This impression is radically enhanced by the Military's deceitful practices. Several prisoners have told me that investigators have impersonated lawyers in an effort to get prisoners to talk.  *See, e.g., Attachment E at 2.*  More recently, a juvenile prisoner explained to me how the interrogator had boasted about her experience in the U.S. Supreme Court and what she was going to do for the young man.  Naturally, this makes the prisoners loath to believe that we are really lawyers on their side.

92. The interrogators consistently tell prisoners that the lawyer's advice is wrong, that having a lawyer is harmful, and that if the prisoner has a lawyer that makes it less likely that the prisoner will get out.  *See, e.g., Attachment E at 2, 3.*  Indeed, one prisoner has reportedly written wanting to get rid of his lawyer based on representations made to him that he will be freed and should not have a lawyer.

93. Nobody believes that attorney-client discussions are confidential, and there have been suggestions that the Military does monitor supposedly privileged hearings. Certainly, the Military has tried to interrogate the prisoners about what they discussed with their lawyers.  As one prisoner said:

> "We all know that everything we say in these rooms is being monitored by them, and every time we say that we particularly hated being treated in a particular way, we know that this will later be used against us.  There are constant examples of this.  Last time my lawyer was here, I told him that I did not like being spoken to by my ISN number all the time, because it was so dehumanizing.  * * * When I got back to my cell, they suddenly started doing this a whole lot more.  And other things I just don't want to mention."

*See, e.g., Attachment E at 3-4.*  Regardless of whether the Military does violate the order of the court, the prisoners believe they do, a belief based on the consistent deceit and manipulation that the Military has practiced.

94. The requirement that everything said to counsel has to be subjected to review before counsel can speak publicly about it is also a basis for creating mistrust with the prisoners.  As Jamal Kiyemba says, "What am I meant to think of my Attorney-Client Privilege when everything that is in the privilege is being 'reviewed'?" *Attachment E, at 11.*

95. The prison actively seeks to keep the prisoners ignorant of the facts that would be necessary for them to make knowing, intelligent and voluntary decisions concerning their cases.  A stark example is that "nobody among [my then-3 clients] had ever heard of such seminal events at the Abu Ghraib scandal – a critically important event, given the

16

impact of that [on the] world's assessment of Guantanamo Bay." *See, e.g., Attachment E at 3.*

## Long Delays in Getting Counsel

96. Respondents state that 18 prisoners have written asking for legal assistance. *Respondents' Motion, at 8.* With respect to the pro se petitioners, "DoD will soon begin delivering a notification to these detainees to advise them of the ABA's offer to secure them legal representation, and to provide them with the address of the ABA if they desire such assistance." *Respondents' Motion, at 9.*

97. We are told that it was not until after January 2005 that there was a "wave of *pro se* petitions filed by Guantanamo Bay detainees. . . ." *Respondents' Motion, at 12.* We are told that there are 55 pro se petitions that have been filed with the court. *Respondents' Motion, at 7–8.*

98. I understand that there are a number of these prisoners who are also represented in other ways – in other words, while they may have struggled to file a pro se petition after three years, they also tried to get counsel and legal assistance in any other way possible. The ability of a small number (perhaps ten percent) to file a pro se petition hardly negates their desire to secure assistance in other ways.

## Inadequate Descriptions of Legal Rights

99. Respondents suggest, via the declaration of Frank Sweigart, that they have "notified each detainee at Guantanamo Bay of his right to file a petition for habeas corpus, and has provided each detainee with the address of the United States District Court in the event that he desires to submit his own petition to the Court." *Respondents' Motion, at 7.*

100. It would be inappropriate to rely on the Enemy Combatant Notification as sufficient to ensure that the prisoners will get the legal assistance that they need. To my knowledge, not one prisoner has thus far secured counsel through a 'petition' filed as a result of the ECN notice.

101. The prisoners are not even consistently allowed a copy of the ECN to study. For example, Omar Deghayes was not allowed to have a copy of the form, while Jamal Kiyemba was allowed it briefly, and Shaker Aamer was able to keep his copy. *See, e.g., Attachment E at 7.*

102. The ECN states that the Assisting Military Officer (AMO) will help the prisoner to understand his right to file for habeas corpus. *See, e.g., Attachment C at para. 7* ("Please talk to your Assisting Military Officer if you have any questions about this notification. Your Assisting Military Officer will meet with you later."). However, in my experience this is simply not done – certainly not on any systematic level.

17

103.    None of my clients have every heard of an AMO.  They have heard of a
Personal Representative (PR).  Yet, setting aside the ethical propriety of the Military
encouraging non-lawyers to provide legal advice to prisoners, the PR's have provided
inadequate 'advice' in the cases with which I am familiar.

104.    Omar Deghayes received only one visit from a PR (with respect to the
CSRT), and he received no meaningful assistance.  Mr. Deghayes thought the PR was an
interrogator (he was even told he had a "Reservation," the euphemism for interrogation),
the PR would not give Omar his name, would not have his handcuffs taken off, only met
with him for about ten minutes total, and did not tell him until well into the meeting that
he was the PR.  *See First Supplement to Petition for Writ of Habeas Corpus (Deghayes et
all. v. Bush), at 4-5 (filed April 1, 2005).*  Such advice as Mr. Deghayes sought was not
given.  The PR did not, or would not, tell him whether there as any point attending the
CSRT (i.e., whether anyone was being found not to be an Enemy Combatant), what kind
of tribunal it would be, or how he might secure witnesses. *Id. at 5.*  Neither could Mr.
Deghayes get an answer as to how he could file a statement or secure witnesses when (as
a Level 3 or 4 prisoner) he could not have a pen and paper.

105.    In another instance, Shaker Aamer had one meeting with a PR, and that
was prior to his CSRT.  His PR told him:

> "I'm not a lawyer.  I'm more of a middle man.  I'm not
> here to help you.  I cannot give you any advice.  I'm jus
> here to take what you want to send to the [CSR] tribunal."

*See, e.g., Attachment I at 1.*

106.    According to Jamal Kiyemba when, prior to my being able to visit him, he
asked for help understanding the habeas process, he found that "the advice is
incomprehensible.  The officers [PR/AMO] who are meant to explain the habeas corpus
process to us do not know." *See, e.g., Attachment E at 9.*

107.    Since meeting with my clients, I have instructed instructed them to request
to meet with the PR/AMO on a regular basis as they have to present a meaningful case to
their ARB.  I provided my clients with a list of suggested questions that they might ask
about the ARB, as well as the habeas process.  To my knowledge, to date no PR/AMO
has responded to the request of *any* of my clients even for a meeting, let alone to provide
this information.

108.    Obviously it is possible that some of the PR's have done a more
competent job than the ones who have met with my clients.  However, this is a matter
that is entirely in the hands of the Military, and the prisoners who are being held
incommunicado cannot be required to prove what has and has not happened in their cases
while being denied access to lawyers and the outside world.

18

### Problems stemming from the different
### cultures and languages of the prisoners

109.    There are many problematic issues of translation in Guantanamo Bay. The ECN explanation is apparently one such issue. Some prisoners who are bi-lingual and have seen the ECN in both English and Arabic. They say that the ECN is hard to understand even in English, but even harder in Arabic. *See, e.g., Attachment G, H; see also Attachment F.*

110.    The prisoners are told that they "may ask a civilian judge to look at the lawfulness of your detention through a process called a *petition for a writ of habeas corpus.*" *Attachment C, at para. 6* (emphasis in original). Recently, a very sophisticated graduate of Oxford University who is in his sixties asked me what a "writ of habeas corpus" actually was, and what it meant to file a petition. If an educated person steeped in the culture of a country with the Anglo-American habeas system does not understand the process, it is far from evident that someone without the benefit of an Oxford education person from a country with a wholly different legal system will do so.

111.    To tell a prisoner that a civilian judge will "look at the lawfulness of your detention" hardly informs the prisoner what he needs to know. Indeed, my various clients insisted to me that they wanted to act as next friends to other prisoners, because they felt that a prisoner from a Middle East country who did not speak English would face insurmountable problems seeking legal assistance on his own.

### Problems counsel would face in getting more information
### about a prisoner without being able to meet with that prisoner

112.    To the extent that the Court might insist that more information be supplied by the next friends about the prisoners this is possible in some cases, but at a minimum it would cause a tremendous delay in securing legal assistance for the prisoners.

113.    For some prisoners it would be hard to get more information, simply because of the rules that the Military has imposed. As Jamal Kiyemba notes, "many prisoners are held under circumstances under which they cannot talk to any 'friend.' For example, in Camp Echo, there is no talking to any other punishment, or you are punished. . . ." *Attachment E, at 9.* Camp V has now taken over from Camp Echo as the solitary confinement camp, and the prisoners are not meant to have any contact there.

114.    In some cases, it might be possible to find out such information. The lawyer for the prisoner who wishes to act as next friend would have to schedule a visit to Guantanamo. This cannot be done without at least 20 days' notice to the government. The lawyer would then have to meet with the client. If the client needed to get additional information from the other prisoner, this could not be done on one trip, as the client is brought to Camp Echo for the legal visits. Thus, counsel would have to schedule a second trip back to Guantanamo, which would have to be roughly a month later at the

19

earliest. Once this was done, the notes would have to be sent by mail to Washington, D.C., for classification review.

115.   However, the Military moves the prisoners around so that it is not easy for a prisoner always to answer counsel's questions about the person for whom he is acting as next friend.

116.   Equally to the point, Respondents' counsel have previously asked me to secure additional information concerning prisoners when they have been unable to determine who is who. I have tried to do this, when given notice before a trip. For example, on the last trip I secured various information to help Respondents identify prisoners who they could not identify on their own.

117.   It is perplexing to me that Respondents would file this motion without first asking for such assistance. They know that I was in Guantanamo between August 4th and 14th, and could have sought to get the information that they demand while there. Yet they filed their motion after I had returned, and I will not be going back down there until mid-October (assuming that they permit a visit then). It would be November at the earliest that I could therefore get additional information about these clients, delaying their legal rights even more.

### Checks already in Place if Prisoners
### decide they do not Want Lawyers

118.   There should be no concern that the prisoner is going to be provided with counsel when he does not want it. There is already a system in place should the prisoner decide he does not want a lawyer. The U.S. military requires that, by the second time that counsel visits, counsel secures an "Acknowledgement of Representation" form, signed by the prisoner. *See Attachment A.*

119.   I have amended the form originally required by the U.S. Military to include the provision that, if the lawyer is removed from the case, the Center for Constitutional Rights can provide another lawyer. I did this because of some prisoners' concerns that the U.S. military would take steps to remove counsel and the prisoner would be left without anyone.

120.   This form is already a considerable burden on the right to counsel, since many of the prisoners are very worried about signing anything.

### Background of Declarant

121.   I received my *Juris Doctor*, Columbia Law School, in 1984, and I was recognized as a Harlan Fiske Stone Merit Scholar all three years I was there. My previous degree was from the University of North Carolina at Chapel Hill, where I was a John Motley Morehead Scholar from 1978-81. I had completed my British education at

20

Radley College, near Oxford where I received A levels in Physics, Chemistry, Mathematics, and Further Mathematics.

122.    Before turning to the Guantanamo Bay cases effectively full time, I was Director of the *Louisiana Crisis Assistance Center*, for almost eleven years from July 1993 to March 2004).  The *LCAC* is a not-for-profit law foundation devoted to providing legal services to indigent persons facing the death penalty in the South.  I had previously spent nine years as a staff attorney with the Southern Center for Human Rights in Atlanta, Georgia.

*123.*    Over the years, I have been counsel in many very serious criminal cases (mostly capital cases) at all levels of the process, from trial to the United States Supreme Court.  I have tried more than two dozen capital cases to a jury, and been involved in many more cases that did not proceed to trial.  I have been involved as counsel in dozens of capital appeals, and more capital cases in post-conviction and habeas review.  I have been responsible for securing certiorari review in the United States Supreme Court in various cases, including *Johnson v. Mississippi*, 108 S. Ct. 1981 (1988) (unanimous reversal of death sentence for improper consideration of invalid prior conviction); *Shell v. Mississippi*, 111 S. Ct. 313 (1990) (unanimous *per cuiam* reversal of death sentence for invalid consideration of aggravating circumstance); *Minnick v. Mississippi*, 112 L. Ed. 2d 489 (1990) (reversal of conviction for violation of the Fifth Amendment right to counsel); *Lonchar v. Thomas*, 116 S. Ct. 1293 (1996) (certiorari granted moments before petitioner's scheduled execution, resulting in unanimous decision in favor of the death sentenced inmate).  In each case I asked another counsel to argue the case, so that I could focus on the capital trials that I was then responsible for.

124.    I was one of the counsel involved in the initial litigation of the case that eventually became *Rasul v. Bush* ____ S.Ct. ____ (June 28, 2004) (availability of judicial review for prisoners in Guantanamo Bay).

125.    Because of the importance of effective counsel in a meaningful judicial system, I have taken an very active role in systematic litigation on behalf of the right to counsel.  This has included a class action on the right to counsel in capital post-conviction in Mississippi, and a large amount of litigation on the need for adequate funding and caseload limits in Louisiana.

126.    I have taught many legal education programs on a variety of scientific subjects in Arizona, California, the District of Columbia, Florida, Georgia, Illinois, Indiana, Kentucky, Louisiana, Massachusetts, Mississippi, New Mexico, New York, North Carolina, Ohio, Tennessee, Texas, and Virginia.

127.    I have twice been invited to testify before the United States Congress, Sub-Committee on the Judiciary, regarding racial discrimination in capital cases.

128.    I was a member and staff counsel to the *Commission on Human Rights Abuses in Mississippi* (Jackson, Ms., 1993).

21

-46-

129.    In 2000, I was honored by Her Majesty Queen Elizabeth II with the *Order of the British Empire* (OBE) for services to humanity.  For work for indigent persons who could not afford counsel, I received an Honorary LLM Degree, from the University of Wolverhampton, England in 2001, and a *Lifetime Achievement Award*, from *The Lawyer Magazine* (UK April 2003), and *The Law Society* (U.K. Oct. 2003).

130.    I have been author or co-author of various manuals on the effective representation of indigent persons facing serious criminal or capital charges in Louisiana (1987, 1994 eds.), Mississippi (four editions, most recently in 1991) and Georgia (two editions).

131.    I have co-authored various law review articles, the most relevant perhaps being Paduano & Stafford Smith, *The Unconscionability of Sub-Minimum Wages Paid Appointed Counsel in Capital Cases,* 43 Rutgers L. Rev. 281 (1991).

132.    I was a Soros Senior Fellow, courtesy of the Open Society Institute, for 2004-05, and have now been awarded a Rowntree Visionary grant for the next five years to do this charitable work. I had been working on the Guantanamo Bay issues part time even before this, but I resigned as director of the LCAC in August 2004 to devote all of my time to trying to help the prisoners in Guantanamo Bay, because I believe passionately that if we are going to preserve our standing as proponents of human rights, as Americans we must show that we mean what we say, and adhere to the rule of law in the most difficult cases, as well as the easiest.  My main role in that position has been to work to ensure that prisoners in Guantanamo Bay were able to get counsel, and effective representation.  I have assumed this role solely because the work so obviously needed to be done.  I must stress at every turn, however, that my resources are wholly inadequate for the purpose.

133.    I am now based in the United Kingdom.  I have dual US and UK nationality.

### Conclusion

THE FOREGOING is executed under the penalties of perjury, constitutes a true and accurate account of what I know, and does not exhaust the sum of my knowledge.

Done this ___ day of June, 2005, in London, England.

_____
CLIVE A. STAFFORD SMITH

22