**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MAJID ABDULLA AL JOUDI, *et al.*, ) | |
| ) | |
| ) | |
| Petitioners, ) | |
| ) | |
| v. ) | Civil Action No. 05-301 (GK) |
| ) | |
| GEORGE W. BUSH, ) | |
| President of the United States, *et al.,* ) | |
| ) | |
| Respondents. ) | |
| ) | |
| JARALLAH AL-MARRI, *et al.*, ) | |
| ) | |
| ) | |
| Petitioners, ) | |
| ) | |
| v. ) | Civil Action No. 04-2035 (GK) |
| ) | |
| GEORGE W. BUSH, ) | |
| President of the United States, *et al.,* ) | |
| ) | |
| Respondents. ) | |
| ) | |
| MUHAMMAD AL-ADAHI, *et al*., ) | |
| ) | |
| ) | |
| Petitioners, ) | |
| ) | |
| v. ) | Civil Action No. 05-280 (GK) |
| ) | |
| GEORGE W. BUSH, ) | |
| President of the United States, *et al.,* ) | |
| ) | |
| Respondents. ) | |

```
                                              )
HAMID AL RAZAK, et al.,                       )
                                              )
                                              )
            Petitioners,                      )
                                              )
      v.                                      )          Civil Action No. 05-1601 (GK)
                                              )
GEORGE W. BUSH,                               )
President of the United States, et al.,       )
                                              )
            Respondents.                      )
                                              )
```

## RESPONDENTS' SUPPLEMENTAL OPPOSITION TO PETITIONERS' MOTION TO COMPEL ACCESS TO COUNSEL AND INFORMATION RELATED TO MEDICAL TREATMENT

Pursuant to the Court's directive at the October 14, 2005 hearing on Petitioners' Motion to Compel Access to Counsel and Information Related to Medical Treatment, respondents hereby supplement their opposition to petitioners' Motion to Compel Access to Counsel and Information Related to Medical Treatment. With this response, respondents submit the Declaration of Dr. John S. Edmondson, M.D., Commander of the U.S. Navy Hospital at Guantanamo, Task Force Surgeon for Joint Task Force-Guantanamo, and head of the Guantanamo detainee hospital (Oct. 19, 2005) (attached as Exhibit A) ("Edmondson Decl."), which responds to the allegations contained in the various declarations submitted by petitioners, including, in particular, the Supplemental Declaration by Julia Tarver, Esq., filed in Al Joudi v. Bush, Case No. 05-301 (GK) (dkt. no. 46) (Oct. 14, 2005) ("Tarver Decl."). As explained in respondents' initial opposition and as demonstrated below and in the Edmondson Declaration, contrary to petitioners' stories, every detainee, including those on hunger strikes, receives extensive, high-level medical care that is administered in a humane manner. Petitioners' allegations to the contrary are simply false. Petitioners therefore have failed to demonstrate that

they will experience irreparable harm without an injunction, and also have failed to establish a

substantial likelihood of success on their claims of deficient medical treatment in light of the

substantial legal authority standing for the proposition that courts should not second-guess the

judgment of Executive officials and physicians regarding the operation of detention facilities and

the medical care provided to detainees.

## I.    Petitioners Fail to Carry Their Burden of Demonstrating Irreparable Harm.

It bears repeating that petitioners are seeking preliminary injunctive relief which "is an

extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear*

*showing*, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997)

(emphasis in original); Cobell v. Norton, 391 F.3d 251, 258 (D.C. Cir. 2004). To prevail in a

request for a preliminary injunction, a movant "must 'demonstrate 1) a substantial likelihood of

success on the merits, 2) that [he] would suffer irreparable injury if the injunction is not granted,

3) that an injunction would not substantially injure other interested parties, and 4) that the public

interest would be furthered by the injunction.'" See Katz v. Georgetown Univ., 246 F.3d 685,

687-88 (D.C. Cir. 2001) (quoting CityFed Financial Corp. v. Office of Thrift Supervision, 58

F.3d 738, 746 (D.C. Cir. 1995)). Petitioners have not satisfied these requirements.

Petitioners have failed to provide sufficient, credible evidence that they will be

irreparably injured if the Court denies their motion for preliminary injunctive relief. The various

inflammatory allegations of inadequate medical care and abusive treatment of hunger-striking

detainees contained in the supplemental declarations in this matter are false, not credible, and

insufficient to overcome the evidence in the declarations of Major General Hood and Dr.

Edmondson, which demonstrate that detainees at Guantanamo receive comprehensive medical

care and that the Guantanamo staff takes medically appropriate and humane measures to preserve the lives and health of detainees engaged in hunger strikes.

Petitioners' counsel recount various allegations of their clients including assertions that inexperienced medical professionals administer tube (enteral) feedings, Tarver Decl. ¶ 8; that no anesthesia is used when nasogastric feeding tubes are inserted, id. ¶¶ 10, 14, 27; and that riot guards forcibly removed feeding tubes and exchanged feeding tubes between detainees without sanitizing the tubes so that blood and stomach bile remained on the tubes, id. ¶¶ 15-16, 28.  Dr. Edmondson's sworn declaration directly refutes these incredible and outrageous allegations. Consistent with Guantanamo policy, nasogastric feeding tubes are inserted only by trained and experienced physicians or credentialed registered nurses; guards never insert, remove, or even touch nasogastric tubes.  See Edmondson Decl. ¶¶ 5, 7.  Additionally, when inserting nasogastric tubes, the doctors or nurses always use a lubricant and offer to apply a topical anaesthetic such as lidocaine.  Id. ¶ 6.  Further, nasogastric tubes are always sanitized and have never been inserted into one patient and then used again in another patient.  Id. ¶ 8.[1]

Petitioners' counsel also report assertions that guards used excessive force in restraining petitioners and verbally and otherwise abused hunger-striking detainees, Tarver Decl. ¶¶ 8, 10, 11, 12, 28; that nasogastric tubes have caused detainees to bleed excessively from their noses, vomit blood, and have lesions appear in their throats, id. ¶¶ 7, 10, 11, 28; and that large nasogastric tubes were used and manipulated purposefully to cause more pain to the detainees in

---

[1]  While an earlier protocol allowed a sanitized feeding tube to be reused only for the same detainee, the tubes were never reused in the same detainee without being sterilized prior to each use.  Edmondson Decl. ¶ 9.  That previous protocol, however, was changed after only two days and replaced with the current policy which requires that a new sterile nasogastric tube be used for every insertion.  Id. ¶¶ 8-9.

order to influence them to stop, or punish them for, their hunger strikes, id. ¶¶ 13, 14, 27.  As the sworn declaration of Dr. Edmondson indicates, however, restraints additional to the two-point security-related restraints normally used with respect to all detention hospital patients rarely need to be utilized in order to insert nasogastric tubes.  Edmondson Decl. ¶ 7.  On the rare occasion when additional restraints are required to insert a tube, only soft Velcro medical restraints are used.  Id.  Guards are not permitted to and do not physically or verbally abuse the detainee patients.  See id. ¶¶ 7, 19.  Furthermore, while occasional minor bleeding, nausea, and throat sores may result from the use of feeding tubes, there have been no serious complications among any of the detainees who have received tube feeding.  Id. ¶ 14.   Non-narcotic pain relievers such as ibuprofen are offered for such minor side effects and are typically sufficient to provide relief.  Id.  Additionally, only small nasogastric tubes (3 mm in diameter) are currently used on detainees requiring tube feedings.  Id. ¶ 9.  While larger tubes (4.8 mm in diameter) were used on a few patients in order to allow higher volume and faster feedings consistent with a U.S. Bureau of Prisons protocol, the use of the larger tubes was abandoned after a two-day trial period when it was determined that use of smaller tubes was easier and was more comfortable for the detainees.  Id.; see also supra note 1.  At no point were the larger tubes, or any other tubes, used intentionally to inflict more pain on detainees, as a means to discourage detainees from participating in hunger strikes or otherwise.  Id. ¶ 6.

        Furthermore, petitioners' counsel inaccurately allege that the detainees were told that a court ordered the involuntary feeding of detainees participating in hunger strikes.  See Tarver Decl. ¶ 9.  In reality, as Dr. Edmondson explains, the detainees were told that involuntary feedings were authorized through the lawful order of a higher authority, consistent with

Guantanamo policy in this regard, referring to an order of a higher military authority.  See Edmondson Decl. ¶ 16; Hood Decl. ¶ 4.  Additionally, a copy of a recent court order was provided to one detainee who could speak and read English.  Edmondson Decl. ¶ 16.  The order denied requests for relief with respect to the medical care and treatment of hunger-striking detainees based, in part, on the fact that Guantanamo had procedures in place, including, if necessary, involuntary feedings, to respond to hunger strikes.  See id.

Petitioners' counsel also detail assertions that detainee ISN 114, whom petitioners refer to as Yousef Al-Shehri,[2] can no longer walk, has lost some of his vision, is vomiting every day, and urinates only once every few days.  See Tarver Decl.¶ 18.  Counsel also recount that this detainee, after being in the hospital, was returned to his cell block where he remained for five days without any food or water and without any tube feeding, id. ¶ 12, and that he was then transferred to a location for the mentally disturbed, id. ¶ 13.  Contrary to these assertions, Al-Shehri is in stable condition; is able to walk, talk, and participate in exercise periods; and has not had any serious complications from his hunger strike other than weight loss.  Edmondson Decl. ¶ 17.  During September 2005, after being released from a stint in the detention hospital, Al-Shehri was returned to his cell block without a feeding tube for a period of only two days in order to encourage him to eat on his own.[3]  Id.  He was offered food and water during that time, but he

---

[2]  The Declaration of Dr. Edmondson refers to specific detainees by their internment serial number ("ISN").  To avoid any confusion as to the identity of particular detainees, detainee ISN 114 is named in the Al Joudi petition as Yousif Mohammad Mubarak Al Shehri and identified in respondents' factual return as Yusef Modaray.  This detainee provided the basis for many of the allegations contained in the Supplemental Declaration by Julia Tarver, Esq., where he is identified as Yousef Al-Shehri.  See Tarver Decl. ¶ 5.

[3]  It bears noting that hunger-striking detainees are regularly counseled concerning the risks of not eating and of alternatives to involuntary feeding.  Edmondson Decl. ¶ 10.  Further,

refused it and was then returned to the detention hospital where he was re-hydrated and his tube

feeding was resumed.  Id.  Additionally, while Al-Shehri was temporarily moved to the new

mental health wing of the detention hospital when that wing was not yet otherwise occupied, this

move was done only because space was needed within the hospital and the wing was available as

an overflow medical care facility.  Id. ¶ 17.  He was not sent there for any mental health or

psychological purposes.  See id.

    Petitioners' counsel also allege that the health and physical appearance of detainee ISN

440, whom petitioners refer to as Muhammad Ali Adbullah Bawazir,[4] are drastically

deteriorating.  See Supplemental Declaration of John P. Anderson in Support of Petitioners'

Reply Memorandum in Support of Their Motion to Compel Access to Counsel and Information

Related to Petitioners' Medical Treatment, filed in Al-Adahi v. Bush, Case No. 05-280 (GK)

(dkt. no. 59, Ex. A) (Oct. 5, 2005).  Dr. Edmondson, however, explains that his condition is

stable, his prognosis is good, and he is capable of necessary physical activity.  Edmondson Decl.

¶ 18.

    In sum, every allegation contained in petitioners' supplemental declarations regarding

inadequate and abusive medical care is false[5] and is rebutted in the Declaration of Dr.

---

the condition of hunger-striking detainees is regularly monitored both by observation and
medical testing to preserve the detainees' lives and health.  Id.

  [4]  Detainee ISN 440 is named in the Al-Adahi petition as Muhammad Ali Adbullah
Bawazir and identified as Mohammed Ali Fowza in respondents' factual return.  This detainee
provided the basis for the allegations contained in the Supplemental Declaration of John P.
Anderson.

  [5]  Allegations of mistreatment and abuse by al Qaeda affiliated enemy combatants should
be viewed with skepticism.  A training manual for al Qaeda was seized at the home of an al
Qaeda member in Manchester, England, and introduced into evidence in the 2001 trial in the
Southern District of New York of al Qaeda operatives for embassy bombings in 1998.  See Gov't

Edmondson.  As noted by Dr. Edmondson, the highly appropriate protocols for treating hunger-striking detainees detailed in Major General Hood's declaration are, in fact, implemented and followed, obviating any need for court intervention.  See Edmondson Decl. ¶ 4.[6]

As discussed at the hearing, five other Judges of this Court recently have found similar allegations of abuse, torture, inhumane conditions, and mistreatment of hunger-striking detainees to be insufficient to overcome the true facts, as reflected in the Hood and Edmondson declarations, and have denied similar requests for preliminary injunctive relief.  First, on September 28, 2005, Judge Oberdorfer denied motions for preliminary injunctions concerning conditions of confinement and hunger strikes at Guantanamo that were filed by petitioners in El-Banna v. Bush, Case No. 04-1144 (RWR), Deghayes v. Bush, Case No. 04-2215 (RMC), Aziz v. Bush, Case No. 05-0492 (JR), Imran v. Bush, Case No. 05-0764 (CKK), and Al Habashi v.

---

Exs. 158, 1677-T, introduced into evidence in United States v. Bin Laden, No. S(7) 98 Cr. 1023 (LBS) (S.D.N.Y.) (pertinent excerpt submitted herewith as Exhibit B; full version available at http://www.justice.gov/ag/trainingmanual.htm).  That manual encourages al Qaeda members to complain of mistreatment while detained as one prong of a calculated strategy to resist and defeat any confinement.

[6]  The detainee allegations contained in petitioners' supplemental declarations can be viewed as additional examples of the detainees' efforts to undermine the ability of the Guantanamo staff to conduct their mission effectively.  Counsel for petitioners in another case – Anam v. Bush, Case No. 04-1194 (HHK) – previously lodged an ethics complaint against Dr. Edmondson before the California Medical Board related to his service as head of the detainee hospital at Guantanamo.  See Petitioners' Reply Memorandum in Support of Their Motion to Compel Access to Counsel and Information Related to Petitioners' Medical Treatment at 11-12, Al Joudi v. Bush, Case No. 05-301 (GK), (dkt. no. 44) (Sept. 29, 2005).  The complaint is based on allegations by detainee-petitioners that medical care at Guantanamo is tied to a detainee's cooperation in interrogations and related matters – allegations that were specifically refuted in Dr. Edmondson's prior sworn declaration.  See April 11, 2005 Edmondson Declaration ¶ 10 (attached as Exhibit G) (originally submitted in O.K. v. Bush, Case No. 04-1136).

Bush, Case No. 05-0765.[7]  See El Banna v. Bush, 2005 WL 2375073 (D.D.C. 2005).  In denying

the motions, which also contained a number of extraordinary allegations,[8] Judge Oberdorfer

relied on the declaration of Major General Hood to conclude that petitioners had not "carried

their burden of proving an imminent threat by respondents to the health and life of the hunger-

striking movants."  Id. at *2; see also id. at *1 ("The movants here . . . have failed to demonstrate

an imminent threat to their health.").

Second, on October 3, 2005, Judge Bates issued an order in Hamlily v. Bush, Case No.

05-CV-763 (JDB), denying an identical "motion for a preliminary injunction" concerning

conditions of confinement and hunger strikes "[f]or the reasons stated by Judge Oberdorfer in his

decision."  See Order at 1 (attached as Exhibit C).

Third, on October 5, 2005, Judge Kennedy denied a motion for temporary restraining

order to compel an emergency counsel visit to Guantanamo in Anam v. Bush, Case No. 05-CV-

1194 (HHK).  See Memorandum and Order (attached as Exhibit D).  The motion arose out of

similar speculation that the Guantanamo staff was not providing sufficient care for detainees

engaged in hunger strikes.  In rejecting petitioners' motion, Judge Kennedy also relied on Judge

Oberdorfer's rationale regarding the inappropriateness of court intervention into the Guantanamo

staff's response to the hunger strikes in the absence of persuasive evidence that any detainee's

health was imminently threatened.  See id. at 3 (stating that "I agree with Judge Oberdorfer's

---

   [7]  The motions were assigned to Judge Oberdorfer through orders in the relevant cases
transferring the motions to Judge Oberdorfer for decision.

   [8]  The motions alleged, inter alia, that scorpions were present in detainees' food, that a
mini-refrigerator was thrown at a detainee, that guard personnel engaged in various forms of
violent mistreatment, and that medical personnel withheld treatment.  See, e.g., El-Banna v.
Bush, Case No. 04-1144 (RWR) (dkt. no. 153).

rationale denying the requested intervention in that case, which rationale, in large measure, is equally applicable to Petitioners' request here.").

Fourth, on October 5, 2005, Judge Urbina denied a motion to compel immediate visits to Guantanamo, telephonic access to detainees, and discovery of medical records in five other cases. See Memorandum Order (attached as Exhibit E). Notably, the motion denied by Judge Urbina was identical to the motion presently under consideration by this Court. Compare Petitioners' Motion to Compel Information Related to Medical Treatment (filed in, inter alia, Al Oshan v. Bush, Case No. 04-520 (RMU) (dkt no. 53)), with Petitioners' Motion to Compel Access to Counsel and Information Related to Medical Treatment (filed in, inter alia, Al Joudi v. Bush, Case No. 05-301 (GK) (dkt no. 41)). Judge Urbina based his decision on several factors, including Major General Hood's declaration, the stay of proceedings in the Guantanamo cases, and the language in Hamdi v. Rumsfeld, 124 S. Ct. 2633, 2650 (2004) (plurality), that lower courts should "'proceed with the caution that is necessary' and only take 'prudent and incremental steps' in resolving the difficult and novel issues" involved in the Guantanamo habeas litigation. See Memorandum Order at 5-6 (quoting Hamdi). For these reasons, Judge Urbina concluded that judicial intervention would be "imprudent." Id. at 6.

Fifth, on September 30, 2005, Judge Kollar-Kotelly denied a motion for temporary restraining order seeking "judicial oversight of the medical treatment of Petitioners" in Al Odah v. Bush, Case No. 02-CV-828 (CKK). See Memorandum Opinion (attached as Exhibit F). The factual basis for the Al Odah motion was similar in many respects to the present motion under consideration by the Court. In Al Odah, petitioners' counsel presented allegations that hunger-striking detainees were in grave condition, or on the verge of death, and had not received

-9-

medical care for their conditions, or had received abusive care related to tube feeding.  These reports were untrue and   Judge Kollar-Kotelly credited the government's evidence in this regard.  The Court concluded that neither court intervention, nor production of medical records, nor telephone access to petitioners was appropriate, i.e., that emergency relief was not warranted. See id. at 13; id. at 6 ("It is clear from Major General Hood's declaration that the Government has regular procedures for determining when detainees are on a hunger strike, when medical intervention is required, and what is the appropriate treatment in order to preserve the lives of detainees."); id. at 13 (finding that the Government provides medical care "to the detainees on hunger strikes . . . calibrated to preserve their life and health").

As demonstrated in the sworn declaration of Major General Hood, and as recognized in the opinions by Judges Oberdorfer, Bates, Kennedy, Urbina and Kollar-Kotelly, Guantanamo personnel have policies and practices in place for responding appropriately to hunger strikes such that no detainee's life or health will be endangered.  Petitioners' allegations to the contrary are simply untrue.  Further, the Edmondson Declaration confirms that Guantanamo's hunger strike policies, including the protocols for tube feedings, are properly and humanely implemented for each hunger-striking detainee.  Accordingly, petitioners have not carried their burden of establishing irreparable harm, and their motion should be denied.[9]

---

[9]  The additional allegation that petitioner Jarallah Al-Marri is being held in solitary confinement is also untrue.  Contrary to petitioners' counsel's speculation, petitioner Al-Marri is held in Camp 1 in a single-person, steel mesh cell like many other detainees, which permits detainees to talk and communicate with one another.  Petitioner Al-Marri was temporarily held in disciplinary segregation for ten days in August of 2005 for throwing urine at guards.

II.     **Petitioners are not Likely to Succeed on the Merits Because They Cannot Demonstrate that Respondents are Deliberately Indifferent to Petitioners' Health Concerns.**

Petitioners' motion should also be denied because they cannot satisfy the demanding legal standard that applies to similar requests for court intervention in the treatment of even domestic U.S. prisoners with constitutional rights.  As noted in respondents' initial opposition, courts have employed the constitutionally-based "deliberate indifference" standard as a guide to evaluate claims of deficient medical care and challenges to conditions of confinement asserted by Guantanamo detainees, even though no court has specifically determined what legal standard should be applied to such claims brought by detainees in the custody of the military and despite the fact that it is presently unclear whether the detainees at Guantanamo even have constitutional rights.  See O.K. v. Bush, 344 F. Supp. 2d 44, 60-63 & n.23 (D.D.C. 2004) (Bates, J.); Al Odah v. United States, No. 02-CV-828 (CKK), Memorandum Opinion at 11-12 (attached as Exhibit F).

Under the "deliberate indifference" standard, a prisoner has the burden of establishing that prison officials "were knowingly and unreasonably disregarding an objectively intolerable risk of harm to the prisoners' health or safety" before a court may involve itself in the treatment of inmates.  Farmer v. Brennan, 511 U.S. 825, 834-35, 846 (1994).[10]  In light of this demanding

---

[10]  Separation of powers principles may require satisfaction of an even more stringent standard here before judicial intervention is warranted, in light of the fact that petitioners are challenging the practices of a military detention center during a time of war.  See, e.g., Hamdi v. Rumsfeld, 124 S. Ct. 2633, 2647 (2004) (plurality opinion) (stating that "[w]ithout doubt, our Constitution recognizes that core strategic matters of warmaking belong in the hands of those who are best positioned and most politically accountable for making them"); Khalid v. Bush, 355 F. Supp. 2d 311, 328 (D.D.C. 2005) (explaining that management of wartime detainees' confinement conditions is the province of the Executive and Legislative branches, thus precluding judicial scrutiny of such conditions).

standard, courts accord substantial deference to the judgment of prison administrators and generally refrain from interfering in the day-to-day operations of correctional facilities, including the provision of medical care.  See, e.g., Bell v. Wolfish, 441 U.S. 520, 548, 562 (1979) (explaining that the operation of even domestic "correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial," and cautioning lower courts to avoid becoming "enmeshed in the minutiae of prison operations."); Inmates of Occoquan v. Barry, 844 F.2d 828, 841 (D.C. Cir. 1988) (noting that "courts are not to be in the business of running prisons" and that "questions of prison administration are to be left to the discretion of prison administrators); Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979) (stating that federal courts will "disallow any attempt to second-guess the propriety of a particular course of treatment" chosen by prison doctors); Martinez v. Mancusi, 443 F.2d 921, 924 (2d Cir. 1971) (declaring that "[o]bviously, courts cannot go around second-guessing doctors.").

In light of the stringent requirements of the "deliberate indifference" standard, petitioners' requests for the production of their medical records, as well as their other requests for relief, should be denied.  As admitted by petitioners' counsel at the hearing, their chief reason for seeking the production of the medical records is to enable them to show the records to another doctor and take additional legal action if warranted in their judgment.  Any such action would seek the type of judicial intervention and oversight of the operations and medical care provided at Guantanamo that is highly discouraged under the law and particularly unwarranted in these cases.

As demonstrated above, the facts do not support a finding that the Guantanamo staff has

been deliberately indifferent to the health or safety of any detainee. To the contrary, the record demonstrates that policies and protocols are in place at Guantanamo for responding appropriately to hunger strikes, which include close monitoring of each detainee's daily intake of food and water, counseling regarding the risks associated with participating in a hunger strike, hospitalization when a detainee's health is impaired, and administration of involuntary feedings when necessary to maintain a detainee's life and health. Hood Decl. ¶¶ 5, 6, 8. Moreover, as explained in Dr. Edmondson's declaration, those policies, including especially the provision of involuntary feedings, have been and will continue to be administered in a humane and appropriate manner. Edmondson Decl. ¶¶ 4-19. Accordingly, petitioners' motion is factually unwarranted and legally unjustified and should be denied.[11]

## CONCLUSION

For the reasons stated above and in respondents' initial opposition, respondents respectfully request that petitioners' motion be denied in all respects.

---

[11] For the foregoing reasons, and as explained in respondents' initial opposition, petitioners' specific requests for relief seeking counsel's immediate in-person and telephonic access to petitioners, phone calls between family members and petitioners, and counsel's access to petitioners' medical records and records regarding respondents' policies pertaining to hunger strikes are all unnecessary and should be denied. In addition, arrangements are presently underway to accommodate a request by petitioners' counsel in Al Joudi to visit Guantanamo in December, further obviating any need for court intervention. Of course, counsel in Al-Marri and Al-Adahi are also free to request additional visits but have not done so.

Dated: October 19, 2005                    Respectfully submitted,

                                           PETER D. KEISLER
                                           Assistant Attorney General

                                           KENNETH L. WAINSTEIN
                                           United States Attorney

                                           DOUGLAS N. LETTER
                                           Terrorism Litigation Counsel

                                           ___/s/ Edward H. White_____
                                           JOSEPH H. HUNT (D.C. Bar No. 431134)
                                           VINCENT M. GARVEY (D.C. Bar No. 127191)
                                           TERRY M. HENRY
                                           JAMES J. SCHWARTZ
                                           PREEYA M. NORONHA
                                           ROBERT J. KATERBERG
                                           ANDREW I. WARDEN
                                           NICHOLAS J. PATTERSON
                                           EDWARD H. WHITE (D.C. Bar No. 468531)
                                           United States Department of Justice
                                           Civil Division, Federal Programs Branch
                                           20 Massachusetts Ave., N.W.
                                           Washington, DC  20530
                                           Tel:  (202) 514-4107
                                           Fax:  (202) 616-8470

                                           Attorneys for Respondents