**EXHIBIT F**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FAWZI KHALID ABDULLAH FAHAD AL ODAH, *et al.*, <br><br> Petitioners, <br><br> v. <br><br> UNITED STATES OF AMERICA, *et al.*, <br><br> Respondents. | Civil Action No. 02-828 (CKK) |

**MEMORANDUM OPINION**
(September 30, 2005)

**I.   INTRODUCTION**

Counsel for Petitioners have filed a motion for a temporary restraining order seeking an order from the Court requiring broad judicial oversight of the medical treatment of Petitioners, including requiring the Government to provide both the Court and Petitioners' counsel with periodic reports on the medical condition of the detainees as well as access to the detainees' medical records, and to permit telephone communications between the detainees and family members.

After careful consideration of the parties' briefs and the relevant law, the Court shall deny Petitioners' motion for a temporary restraining order and request for a hearing.

**II.   LEGAL STANDARD**[1]

For Petitioners to obtain the emergency relief they seek, they must establish (1) that they

---

[1] The Court notes that the parties did not present their arguments on this motion in the appropriate framework required for considering a request for a temporary restraining order. The Court has provided this legal framework, and evaluated the pleadings accordingly.

possess a substantial likelihood of success on the merits; (2) that they would suffer irreparable injury if the injunction were not granted; (3) that an injunction would not substantially injure other interested parties; and (4) that the public interest would be furthered by the injunction. *See Serono Lab. v. Shalala*, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998); *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995); *Sea Containers Ltd. v. Stena AB*, 890 F.2d 1205, 1208 (D.C. Cir. 1989); *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977); *Vencor Nursing Ctrs. v. Shalala*, 63 F. Supp. 2d 1, 7 n.5 (D.D.C. 1999) (noting that the same factors apply to a temporary restraining order as to a preliminary injunction). No single factor is dispositive; rather the Court "must balance the strengths of the requesting party's arguments in each of the four required areas." *CityFed*, 58 F.3d at 747. This calculus reflects a sliding-scale approach in which an injunction may issue if the arguments for one factor are particularly strong "even if the arguments in other areas are rather weak." *Id.* Thus, the U.S. Court of Appeals for the District of Columbia Circuit has held that "[a]n injunction may be justified, for example, where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury." *Id.*

### III.    DISCUSSION

####      A.    *Factual Background*

This motion for a temporary restraining order concerns two of the Kuwaiti Petitioners, Fawzi Al Odah and Abdulazziz Al Shammari, who are currently taking part in a hunger strike.[2]

---

[2]Counsel for Petitioners indicate briefly in their motion that when they met with another of their clients, Abdullah Al Kandari, they discovered that he too was on a hunger strike. *See* Petrs.' Mot. at 9. The Government has indicated that although Mr. Al Kandari was categorized as being on a hunger strike on September 10, 2005, he received counseling on September 11 and

Counsel for Petitioners originally requested a temporary restraining order on August 30, 2005, seeking intervention from the Court with respect to scheduling a visit with Petitioners in September. At that point, counsel for Petitioners had information from another detainee in the form of an unclassified statement that a hunger strike was taking place, and counsel sought to determine the state of their clients' participation in the hunger strike and their health.

 Over the course of several conference calls on the record with the Court and the parties, held on August 30-31, 2005, it became clear that several Kuwaiti detainees were participating in the hunger strike. The parties reached an agreement permitting counsel to schedule a visit to meet with some of their clients on September 13-14, 2005. Having left open the question of how counsel would interview their clients if some of them were hospitalized as a result of the hunger strike, counsel for Petitioners requested that their August 30, 2005, motion for a temporary restraining order be held in abeyance.

 Counsel for Petitioners flew down to Guantanamo Bay, Cuba, on September 12, 2005. While en route, they received word from Government counsel that the medical condition of Fawzi Al Odah and Abdulazziz Al Shammari was such that it was not clear whether Petitioners' counsel would be able to meet with them because they could be hospitalized. On the morning of September 13, 2005, Petitioners' counsel met with two detainees, not the ones at issue in the instant motion, who indicated that Fawzi Al Odah and Abdulazziz Al Shammari were in grave condition and about to expire as a result of the hunger strike. Petitioners' counsel called the

---

12, 2005, and he resumed eating meals on September 12, 2005. Resps.' Opp. Ex. B (Henry Decl.) ¶ 6. After eating three consecutive meals, he was no longer classified as on a hunger strike on September 13, 2005. *Id*. Petitioners have not disputed the Government's representation in their Reply.

3

Court from a payphone at Guantanamo Bay, and the Court held a conference call on the record with counsel for both parties.  The Court asked counsel for the Government to arrange for Government counsel and the Court to speak directly with a physician knowledgeable as to the medical condition of the two detainees, not through a third party.  Counsel for Petitioners agreed that the Court and Government counsel could speak to the physician *ex parte*.

At 4:30 PM on September 13, 2005, the Court held a conference call on the record with counsel for the Government and three military officers, including the physician who serves as the Officer-in-Charge[3] of the detention hospital.  The doctor indicated that he was personally familiar with Fawzi Al Odah and Abdulazziz Al Shammari.  Tr. 7:17-20.  He stated that Mr. Al Odah had been on a hunger strike since August 8, 2005, and had lost about ten percent of his body weight, placing his weight at about eighty percent of his ideal body weight.  Tr. 8:1-10.  On September 4, 2005, the medical staff had started tube feeding Mr. Al Odah, a procedure which the doctor indicated was still taking place at the time of the hearing.  Tr. 8:12-14.  The tube feeding, which was involuntary, consisted of a tube passing through Mr. Al Odah's nose into his stomach, allowing the medical staff to infuse the nutritional formula through the tube and into his stomach.  Tr. 9:15-18 ("He is receiving what we call involuntary feeding, ma'am.  He has a – into his nose into his stomach and then we are infusing nutritional formula into his stomach directly.").  The doctor indicated at that time that Mr. Al Odah was clinically stable, had stable vital signs, and conversed with the doctor that day "very well."  Tr. 8:14-16.  The doctor stated that Mr. Al Odah was weak, and as a result "had a little bit of difficulty with ambulation," which required him to

---

[3] The Court has sealed the name of this doctor, but has unsealed the transcript of the conference call.

use a walker. Tr. 8:16-24. The doctor stated that as long as Mr. Al Odah "continues to receive nutrition his prognosis is very good." Tr. 9:9-10. The doctor stated that Mr. Al Odah's treatment plan was scheduled to be modified on the following Thursday morning to allow Mr. Al Odah to receive feeding twice per day on an outpatient basis at the hospital, rather than requiring him to remain in the hospital at all times. Tr. 10:1-10. The doctor indicated that, if the treatment proceeded as planned, Mr. Al Odah would be able to meet with his counsel on Thursday in the normal space for attorney-client meetings. Tr. 10:15-20.

With respect to Abdulazziz Al Shammari, the doctor indicated that he had been on a hunger strike since August 4, 2005, and had lost about five percent of his body weight, leaving him at about seventy-nine percent of his ideal weight. Tr. 11:11-14. Mr. Al Shammari was being fed twice per day at the hospital on an outpatient basis. Tr. 11:16-18. The doctor indicated that at that time, his medical condition was stable, he was communicative, and he walked unassisted. Tr. 12:4-9. The doctor also stated that Mr. Al Shammari would be in a position to meet with his counsel during their visit. Tr. 12:8-12.

That Thursday, September 15, 2005, counsel for Petitioners were able to meet with both Mr. Al Odah and Mr. Al Shammari. Counsel spoke with their clients in the normal interview facilities. Although the two Petitioners' feeding tubes were still in place, they were not being fed at the time. Upon their return to Washington, DC, counsel for Petitioners filed the instant motion for a temporary restraining order, arguing that their clients' condition was such that Court oversight of their medical care, and the intervention of the Petitioners' families were required. Counsel for Petitioners disputed the doctor's assessment of the detainees' ambulatory abilities.

*See* Petrs.' Mot. at 10-11.  Counsel also suggested that the doctor had stated that Mr. Al Odah was receiving nutrition directly into his stomach, i.e., not through a nasal tube, and counsel perceived this to be a misrepresentation on the doctor's part.  *Id*. at 11.  In addition, counsel suggested that the detainees had been falsely told that the military authorities at Guantanamo Bay had obtained court orders authorizing the tube feeding.  *Id*.

The Government opposed Plaintiffs' motion, including supporting declarations by counsel for the Government, who had communicated with the physician, and Major General Jay W. Hood, who serves as the Commander of the Joint Task Force-Guantanamo ("JTF-GTMO"). It is clear from Major General Hood's declaration that the Government has regular procedures for determining when detainees are on a hunger strike, when medical intervention is required, and what is the appropriate treatment in order to preserve the lives of the detainees.  Major General Hood has stated that "[c]onsistent with Department of Defense policy the JTF will prevent unnecessary loss of life of detainees through standard medical intervention, including involuntary medical intervention when necessary to overcome a detainee's desire to commit suicide, using means that are clinically appropriate."  Resps.' Opp. Ex. A (Hood Decl.) ¶ 2.  Furthermore, "it is JTF-GTMO's standard operating procedure . . . to avert death from hunger strikes and failure to drink, as well as to monitor the health status of detainees who are fasting voluntarily," and "[e]very attempt will be made to allow detainees to remain autonomous up to the point where failure to eat or drink might threaten their life or health."  *Id*. ¶ 4.  When a detainee has declined food and water for nine consecutive meals or for more than two days, the detainee's medical condition is evaluated, and "if medical personnel have reason to believe that the continuation of a

voluntary fast or hunger strike could endanger a detainee's health or life, the detainee will be admitted to the detention hospital." *Id*. ¶¶ 4-5.  If, after counseling with respect to the risks of a hunger strike and nutritional alternatives, a detainee continues to refuse to eat and/or drink, Major General Hood "will authorize doctors to administer treatment without the consent of the detainee," which "can include use of intravenous means or a feeding tube." *Id*. ¶¶ 6-8.

The doctor stated to counsel for the Government that Fawzi Al Odah and Abdulazziz Al Shammari "were counseled, consistent with Guantanamo policy, about the risks of not eating and alternatives to involuntary feeding." Resps.' Opp. Ex. B (Henry Decl.) ¶ 4.  Government counsel also stated that the detainees had not been told that the feeding was authorized by court order, but "[r]ather, these detainees were told that their involuntary feeding was authorized through the lawful order of a higher authority, consistent with Guantanamo policy." *Id*.

### B.    *Petitioners Have Not Met the Standard Required for the Relief Sought*

There can be no dispute that there exists a strong public interest in ensuring that the detainees at Guantanamo Bay receive appropriate, humane treatment, including medical care. However, even with this as a first principle, the Court finds that it does not require an evidentiary hearing, and finds that Petitioners have not met the standard required in order for the Court to order the injunctive relief Petitioners seek.

#### 1.    **The Court Finds No Material Inconsistencies in the Record**

Counsel for Petitioners raise a number of alleged inconsistencies between the doctor's testimony with respect to their clients and counsel's own observations during their interviews.  In particular, counsel indicated that in contrast to the doctor's statements, Mr. Al Odah did not need

assistance walking, while Mr. Al Shammari needed a walker. Petrs.' Mot. at 10-11. Counsel has suggested that the doctor has confused these two detainees. *Id*. Counsel also suggested that the doctor had stated that Mr. Al Odah was receiving nutrition directly into his stomach, i.e., not through a nasal tube, and counsel perceived this to be a misrepresentation on the doctor's part. *Id*. at 11. In addition, counsel suggested that the detainees had been falsely told that the military authorities at Guantanamo Bay had obtained court orders authorizing the tube feeding. *Id*.

The Court finds that, although the condition of the two Petitioners is clearly serious, counsel's suggestion that the Government has misrepresented the circumstances of their medical treatment is unsupported. With respect to the two detainees ambulation, the Court recognizes that the doctor and counsel saw these two men on different days and in different settings. These two men have voluntarily engaged in a hunger strike, and it is to be expected that their condition, and their ability to walk unaided, may fluctuate. This does not lead ineluctably to the Petitioners' counsel's conclusion that the doctor confused the two detainees. Indeed, the doctor has informed counsel for the Government specifically that he did not confuse the two individuals, *see* Resps.' Opp. Ex. B (Henry Decl.) ¶ 3, and the Court does not find support for a different conclusion because the observations of the doctor and counsel took place at different times and in different places. Moreover, on the conference call, the doctor told the Court in response to questioning that his description of their condition was based on personal observation at the hospital.

The Court also does not agree with Petitioners' counsel's assertion that the doctor stated that the detainees were being fed by anything other than a tube through the nose and into the stomach. The doctor stated that Mr. Al Odah is fed through a tube "into his nose into his

8

stomach and then we are infusing nutritional formula into his stomach directly." Tr. 9:15-18. During the conversation, the Court understood this to mean that the formula was provided through the tube in the nose and down into the stomach. Counsel for Petitioners, who were not present for the Court's discussion with the doctor, have misunderstood the doctor's statement. Finally, the Court has considered Petitioners' counsel's allegation that their clients were told that the involuntary feeding was court-ordered, as well as the Government's response indicating that the Petitioners were informed that the feeding was "authorized through the lawful order of a higher authority, consistent with Guantanamo policy," meaning military order. Resps.' Opp. Ex. B (Henry Decl.) ¶ 4. The Government has explained that the policy followed by the Government with respect to the detainees requires that involuntary feeding must be authorized by Major General Hood, who is clearly a "higher authority" in this context. Consequently, the Court finds the Government's explanation to be reasonable.

   Considered in this light, the Court finds that the facts do not suggest an emergency requiring the extraordinary relief of Court oversight, access to medical records, and direct contact with family members requested by Petitioners. The Court finds no material inconsistencies between Petitioners' counsel's observations and the Government's representations with respect to the detainees' medical condition. It is clear that the Government has specific procedures in place to determine whether a detainee is on a hunger strike, and at what point that hunger strike endangers the detainee's life. Procedures exist for counseling the detainee on the risks of such a course of action, and ultimately for preserving the detainee's life through involuntary feeding. It is also clear that in this case, the Government has implemented these procedures, and that Mr. Al

9

Shammari and Mr. Al Odah, although in weakened condition, are receiving nutrition and medical care sufficient to keep them medically stable and alive.

### 2. There is no Legal Basis for the Relief Petitioners Seek

Petitioners have requested that the Court order periodic reports and grant access to medical records for Mr. Al Odah and Mr. Al Shammari, as well as allow direct communications between the two detainees and their family members. Petrs.' Mot. at 1. Petitioners' motion makes clear that "counsel for the Kuwaiti Detainees and the family members of the Kuwaiti Detainees . . . support all legitimate efforts to preserve the lives of the Kuwaiti Detainees who are participating in the hunger strike." *Id*. at 12. In their reply, Petitioners mention briefly the fact that Judge Joyce Hens Green found that Petitioners do enjoy Fifth Amendment Due Process protections. Petrs.' Reply at 5; *see In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443 (D.D.C. 2005); *but see Khalid v. Bush*, 355 F. Supp. 2d 311 (D.D.C. 2005) (Leon, J., finding detainees have no cognizable constitutional rights). Although Judge Green's decision is presently pending on appeal awaiting a decision, Petitioners correctly note that her holding is at present the law in this case. *See* Petrs.' Reply at 5. However, Petitioners' motion does not include allegations that any constitutional rights to which the two detainees may be entitled have been violated by the treatment the detainees are receiving in response to their ongoing hunger strike.

In considering case law addressing similar requests, the Court notes for example that the courts are generally reluctant to involve themselves in the day-to-day operations of correctional facilities. *See Bell v. Wolfish*, 441 U.S. 520, 548, 562 (1979) (noting that "the operation of our

correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial," and cautioning lower courts from "becom[ing] increasingly enmeshed in the minutiae of prison operations."); *see also Inmates of Occoquan v. Barry*, 844 F.2d 828, 841(D.C. Cir. 1988) (noting that "courts are not to be in the business of running prisons," and that "questions of prison administration are to be left to the discretion of prison administrators.").

The courts have also developed a body of law addressing the appropriate standard by which to review the conditions of an individual's confinement. Broadly speaking, the courts have held that convicted prisoners are protected by the Eighth Amendment, and conditions of confinement are reviewed under the "deliberate indifference" standard. *See Farmer v. Brennan*, 511 U.S. 825, 835 (1994). This standard requires a showing that the prison officials "knowingly and unreasonably disregard[ed] an objectively intolerable risk of harm." *Id*. at 846. The standard for pretrial detention is phrased differently, providing Fifth Amendment protections requiring that "a detainee must not be punished prior to an adjudication of guilt in accordance with due process of law." *Block v. Rutherford*, 468 U.S. 576, 583 (1984) (quoting *Bell*, 441 U.S. at 535).

In a decision rejecting an emergency request for an independent medical evaluation and medical records of another detainee, Judge John D. Bates of this Court has recognized that the question of which standard applies to detainees at Guantanamo Bay has not been decided. *See O.K. v. Bush*, 344 F. Supp. 2d 44, 61 n.23 (D.D.C. 2004). He also noted, however, that "[a]lthough the Supreme Court has said that the due process rights of pre-trial detainees are at least as great as the Eighth Amendment rights of a convicted prisoner . . . most courts have

applied the deliberate indifference standard in both settings . . . ." *Id*. (quotations omitted, citing to *Hill v. Nicodemus*, 979 F.2d 987, 991-92 (4th Cir. 1992)). Judge Bates did not determine whether the deliberate indifference standard applies to any constitutional claims that the detainees at Guantanamo Bay might raise, but rather "[drew] on this well-developed body of law to guide [his] analysis" of the emergency request in his case. *Id*. Ultimately, Judge Bates rejected the petitioner's request for an independent medical evaluation and production of medical records, stating that "[t]he Court is exceptionally reluctant to monitor the medical care of detainees in the absence of a colorable assertion of some substantive violation of a legal right." *Id*. at 62.[4]

The Court has examined the record before it, and finds that Petitioners' requested emergency relief lacks support at this time. Petitioners' counsel have not alleged that the medical care Petitioners have received during their hunger strike has violated any constitutional rights they may have under either the Fifth or Eighth Amendments. Indeed, counsel for Petitioners supports the measures taken to preserve Petitioners' lives. Furthermore, the Court has held a conference call on the record with the doctor overseeing Petitioners' medical care, and the Government has presented sworn declarations explaining the detailed protocols for evaluating the status of detainees engaging in a hunger strike, counseling those detainees, and providing them

---

[4]The Court notes that Judge Louis F. Oberdorfer of this Court has recently denied a motion for preliminary injunction filed in four detainee cases regarding their conditions of confinement. *See, e.g.*, *Imran v. Bush*, Civ. No. 05-764 (D.D.C. September 28, 2005) (order denying motion for preliminary injunction). Judge Oberdorfer denied the request for injunctive relief because he found, *inter alia*, that in light of the Government's policies with respect to medical care of detainees on hunger strikes, the petitioners had failed to demonstrate an imminent threat to their health or life. *Id*. at 4.

with medical care, including tube feeding, gauged to preserve their health and life. It is clear from the record that the Petitioners are in fact medically stable and alive, and receiving ongoing medical care and feeding on an outpatient basis in the detainee hospital.

The Court finds on this record that Petitioners have not demonstrated that they are likely to succeed on the merits. Nor is there any evidence on this record that irreparable harm will result in the absence of Petitioners' requested relief. Although the Court recognizes that there is a significant public interest in the appropriate, humane treatment of the detainees, the Court finds that the Government has provided substantiated evidence that the medical care provided to the detainees on hunger strikes is calibrated to preserve their health and life. At this time, the situation of the Petitioners does not constitute an emergency requiring the Court's intervention. In this light, the Court shall not undertake the broad oversight that counsel for Petitioners requests. The Court shall not order the release of Petitioners' medical records, because counsel has had face to face access to Petitioners, and the physician has described their medical condition. Nor shall the Court order that the families of Petitioners be permitted to speak with them over the telephone while there are other forms of access to the Petitioners that are available to their families.

IV.    CONCLUSION

In keeping with the foregoing reasoning, Petitioners' motion for a temporary restraining order shall be denied.

_____/s/_____<br>
COLLEEN KOLLAR-KOTELLY<br>
United States District Judge