IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

------------------------------------------------------------------X

HAMID AL RAZAK,

Petitioner,

-vs.-

Civil Action<br>05-CV 1601<br>(GK)

GEORGE W. BUSH,
    President of the United States, *et al.,*

Respondents.

------------------------------------------------------------------X

## PETITIONER'S MEMORANDUM SHOWING CAUSE WHY PETITION FOR WRIT OF HABEAS CORPUS SHOULD NOT BE DISMISSED FOR LACK OF "NEXT FRIEND" STANDING

### STATEMENT OF FACTS

Petitioner, HAMID AL RAZAK, is in custody under or by the color of authority of the United States at Guantanamo Naval Base on the island of Cuba and has been so held for an indeterminate amount of time. He has not been charged with a crime nor appeared before a civilian court of law. On June 28, 2004, the Supreme Court held, in *Rasul v. Bush*, ___ U.S. ___, 124 S. Ct 2686, that those in custody at Guantanamo are entitled to *Habeas Corpus* review by United States District Courts. On August 10, 2005, AL RAZAK, through his "Next Friend", BISHER AL RAWL, filed a Writ of Habeas Corpus in this Court.

1

On August 31, 2005, Respondents moved for an Order to Show Cause why the

Petition should not be dismissed and on October 11, this Court issued a

Memorandum Order directing Petitioner to Show Cause why this case should not

be dismissed for lack of proper "Next Friend" standing.

## ARGUMENT

I.    The Special Circumstances Under Which Petitioner Labors, All
      Imposed by Respondents, Severely Incapacitate Petitioner's Access
      to This Court and Renders the Relationship Between Petitioner and
      His "Next Friend" Unique

Petitioner has been detained and imprisoned by Respondents at the U.S.

Naval Base at Guantanamo, Cuba, for an undetermined time, possibly as long as 3

½ years. He has been held incommunicado, in virtual isolation from external

friends and family, as Respondents have refused to divulge the names of the

Guantanamo detainees, their countries of origin, or the names of their relatives.

(See Olshansky Declaration, ¶ ¶ 5, 8, 9, attached hereto as "Exhibit B"). Until

commanded otherwise by the United States Supreme Court in *Rasul v. Bush,* ___

U.S. ___, 124 S. Ct. 2686 (2004), Respondents refused to provide Petitioner with

counsel, refused to permit him to seek judicial relief on his own behalf, and

refused him access to courts even via "next friend" standing. Now that some

Guantanamo detainees, including Petitioner AL RAZAK, seek standing in United

States District Court, via "next friend" status subsequent to the decision in *Rasul,*

Respondents are attacking the validity of even this time-honored method of access

to judicial review. The attack might have merit were Petitioner AL RAZAK held

2

under normal circumstances so that he could obtain, or attempt to obtain, external

assistance in petitioning this Court. But the circumstances to which he is subject

are nowhere near "normal." For example:

> He is a resident of Afghanistan;
>
> He has been allowed virtually no contact with the news media or
> any word from outside the closed Guantanamo prison system for
> the length of his imprisonment;
>
> He has been allowed no contact with his friends or family
> members;
>
> He is unfamiliar with the United States Court System and likely
> does not know what the term *Habeas Corpus* means.
>
> He does not speak English. (He speaks Pashtu, according to his
> "next friend");
>
> He has had no criminal charges brought against him;
>
> He has every reason to distrust his captors and keepers;
>
> He has every reason to rely on his friendships with other prisoners
> who speak his language and suffer under the same disabilities;
>
> Like most Guantanamo prisoners, Petitioner's family members are
> unknown to outsiders, and in almost all cases unreachable by
> prisoners themselves, making it necessary for him to rely on fellow
> inmates for access to courts (See Olshansky Declaration, ¶ 5; See
> also Smith Declaration, ¶¶ 47-77, attached as "Exhibit D" to
> Petitioner's September 9, 2005, Opposition to Respondents'
> Motion for an Order to Show Cause).
>
> No party outside Guantanamo is allowed to be aware of the
> specific camp or building in which Petitioner is being imprisoned,
> nor the "grade" or "level" of penal detention he occupies, each
> level being determinative of the privileges he receives. It cannot
> be known, therefore if Petitioner has access to paper, pen or pencil.

3

He does not have access to a law library;

He cannot communicate with his attorney, nor does he even know at present that he has an attorney;

He has no expectation of release, ever; and

He has every reason to challenge his confinement.

For Respondents to argue that under these circumstances Petitioner AL RAZAK cannot lawfully challenge the legality of his confinement because his "next friend" may not qualify under *Whitmore* guidelines, is irrational at best and more likely disingenuous. It is disingenuous because the very disabilities which prevent Petitioner from contacting external friends and family are imposed by Respondents themselves. Even the dissenters imprisoned in the Tower of London in the 17th century, for whom the *Habeas* Petition became their only remaining thread of British Law, had less severe conditions of isolation than those occasioning Petitioner AL RAZAK herein.

An additional circumstance, also imposed at the insistence of Respondents, makes Petitioner's access to the Courts even more problematic. Petitioner's counsel cannot interview Mr. AL RAZAK in person until he has received security clearance which has not yet been attained. (See Sussman Declaration, ¶ 6, attached hereto as "Exhibit A"). While he recently was interviewed by the FBI, which is conducting its investigation, as long as clearance has not been granted he cannot visit Petitioner to obtain his own consent (or nonconsent) to proceed on his behalf. Had Respondents not requested this unique

4

qualification for attorneys to gain access to their clients or potential clients, the matter under review today could have been resolved before the Petition was filed or shortly thereafter, as Petitioner could have indicated his desire (or lack of desire) for representation to the undersigned in person.

II.    The *Whitmore* Standards are Circumstantially
       Inapplicable to Petitioner Herein

Respondents argue that in *Whitmore v. Arkansas*, 495 U.S. 149 (1990), the Supreme Court set established standards for "next friend" standing which are not fulfilled in the case under review today.

To appreciate these standards adequately, it is necessary to review briefly the facts of that case. The real party in interest in *Whitmore* was named Simmons, an extremely aware if not legally sophisticated Defendant. Simmons was tried, with assistance of counsel, for two of sixteen murders with which he was charged. Subsequent to his conviction and sentence of death, Simmons swore an oath that he wanted no appeal. The trial court conducted a hearing concerning his competence to waive further proceedings and found his decision was knowing and intelligent. As his execution date approached, a priest who counseled inmates petitioned the Arkansas Supreme Court, as Simmons' "next friend," to prosecute the very appeal Simmons did not wish to have pursued. The priest did not indicate that he had ever met Simmons and claimed standing as an "aggrieved taxpayer" and "concerned citizen". His standing was denied. The priest tried once again, this time jointly with another death row inmate, and was denied

5

standing a second time.

Simmons then underwent a second trial, again with the assistance of counsel, for the remaining fourteen murders, found guilty, and again sentenced to death. He again notified the Court of his desire to waive appeal and after another hearing was again found competent to do so. The tribunal considering his competency noted that Simmons had been notified by his attorney of several points of possible reversal upon appeal and that they were all rejected by the condemned man. Three days later another death row inmate, named Whitmore, sought permission to intervene on Simmons' behalf as a "next friend" but was denied standing. Whitmore appealed to the Supreme Court, pursuing the "next friend" issue (among others) and the *Whitmore* decision bears his name.

The Supreme Court acknowledged that it had not previously discussed the concept of "next friend" standing at length, but noted it had long been an accepted basis for jurisdiction "most frequently (when) 'next friends' appear in court on behalf of detained prisoners who are unable, usually because of mental incompetence *or inaccessibility*, to seek relief themselves" (495 U.S. 149, 161-162, emphasis added, citations omitted.)

The *Whitmore* decision then set forth a summary of the "next friend" standards to which lower courts have generally adhered. Such standing is not to be considered automatically granted, the Court ruled. Rather (at 163-164):

> (d)ecisions applying the habeas corpus statute have adhered to at least two firmly rooted prerequisites for "next friend" standing. First, a "next friend" must provide an adequate explanation - such

as inaccessibility, mental incompetence, or other disability - why the real party in interest cannot appear on his own behalf to prosecute the action (citations omitted).  Second, the "next friend" must be truly dedicated to the best interests of the person on whose behalf he seeks to litigate (citation omitted), and it has been suggested that a "next friend" must have some significant relationship with the real party in interest (citation omitted).

[The omitted citations for the first and second standard refer to cases from the 7th and 8th Circuit Courts of Appeal, a Virginia District Court, and the State of California; the "suggestion" comes from a Georgia District Court.]

The underlying philosophy for having such standards, Chief Justice Rehnquist, for the Court, concluded, is "the recognition that 'it was not intended that the writ of habeas corpus should be availed of, as a matter of course, by intruders or uninvited meddlers, styling themselves 'next friends.'  Indeed, if there were no restrictions on 'next friend' standing in federal courts, the litigant *asserting only a generalized interest in constitutional governance* could circumvent the jurisdictional limits of Article III simply by assuming the mantle of 'next friend'" (at 164, emphasis added).

The information available to the undersigned reveals that Petitioner AL RAZAK and his "next friend" AL RAWI cannot fit precisely into the standards set forth in *Whitmore* because of the oppressive circumstance set forth in Argument I, *infra*. These circumstances, created in whole by Respondents and exacerbated by both AL RAZAK's and AL RAWI's lack of legal knowledge and AL RAZAK's lack of knowledge of English, were not even remotely similar to

those which determined the status of Whitmore and Simmons themselves.

The principle theory of *Whitmore*, which underlies the two-pronged test, is that the "next friend" mechanism is meant to provide access to courts for those who are unable, because of inaccessibility, to seek relief themselves. This is stated twice, in Rehnquist's general introduction to the "next friend" concept, quoted herein above, and in his first of the two prong test to be satisfied for "next friend" standing. It finds its way into the first prong as a requirement that the "next friend" explain why the party in interest suffers from inaccessibility.

It is submitted that as *inaccessibility* is Petitioner AL RAZAK's primary circumstance, it is also his primary argument. He lacks access to the courts to seek relief on his own behalf because of the conditions under which he (and his "next friend") labor. To the degree that the first test places a burden upon BISHER AL RAWI to "provide an adequate explanation" of the circumstances of AL RAZAK's inaccessibility, this too is obviated by the existence of circumstances which speak for themselves. BISHER AL RAWI does not know the members of HAMID AL RAZAK's family nor his friends in Afghanistan, nor can be reach them. He knows that he himself has obtained an attorney and that if his friend AL RAZAK cannot obtain one he will continue to remain as inacessible at Guantanamo as he has been for years.

The second *Whitmore* test, that BISHER AL RAWI demonstrate his dedication to AL RAZAK's best interests, is simply impossible for Petitioner to document for similar reasons. The undersigned cannot attest to this Court the

nature of the relationship between AL RAWI and AL RAZAK because he cannot contact AL RAWI any more easily than he can contact his own client. It is simply unknown - - and will remain unknown - - what the depth or quality of their friendship is. On the other hand, some facts are known and supplied by the "next friend's" attorney, George Brent Mickum IV, whose Declaration is attached hereto as "Exhibit C." Attorney Mickum states that BISHER AL RAWI understands English, and Mickum was able to inform his client the legal meaning and necessity of "next friend" status. (¶ 8) Mickum also states that his client has provided him with the names of numerous Guantanamo prisoners who have desired legal representation and on one occasion BISHER AL RAWI was placed in solitary confinement under inhuman conditions for having a list of such names in his possession. (¶ 3, 9) Mickum concludes that this, in itself, is a rather extraordinary demonstration of friendship. (¶ 9)

It can therefore hardly be said that "next friend" AL RAWI's interest in assisting AL RAZAK constitutes "asserting only a generalized interest in constitutional governance" (See Rehnquist's fear articulated in *Whitmore* at 164, based upon the fact that Simmons had styled himself an "aggrieved taxpayer" and a "concerned citizen".) AL RAWI's letter states plainly "that he (AL RAZAK) would want me to assert any legal right he may have."(Exhibit A" to the Petition) AL RAWI's interest, as detailed by his attorney, George Mickum, is in obtaining the release of himself and his fellow inmates.

Whitmore had a trial with counsel; two trials with counsel in fact. He had

9

two further hearings at which independent tribunals determined that he was capable of knowingly waiving an appeal.  Two separate individuals on two separate occasions sought "next friend" status not only without Simmons' consent or approval but *over his stated objection*.  Whitmore was found, subsequent to being afforded due process of law, to be a mass murderer.  All Petitioner AL RAZAK seeks is to have his Petition brought before this Court, and Respondents well know that if it is not so presented, Petitioner will have no access to *any* civil court,  ever.

There is no evidence that AL RAWI or AL RAZAK are "intruders" (as was Whitmore) or uninvited (as was Whitmore) nor "meddlers," unless seeking to have one's lengthy  incarceration without charge and without trial judicially reviewed for the first time can be considered as "meddlesome."  It would strain credulity and human decency to think so.

One wonders, given Respondents' position in this matter, what recourse a Guantanamo prisoner may have if he has no family members to contact nor any friends in confinement with him who satisfy the degree of intimacy required by the *Whitmore* tests.

According to Clive Statford-Smith, who represents a number of Guantanamo prisoners as co-counsel for the Center for Constitutional Rights, and who has traveled extensively in the Mid-East seeking family members of the prisoners, to request that a family member be a "next friend" might put the said family member in danger in the foreign country of one's residence.  (Exhibit "D"

attached to Petitioner's Opposition to Motion for Order to Show Cause, ¶ 74.)

Surely the letter of "next friend" BISHER AL RAWI constitutes sufficient evidence of a *prima facie* right of HAMID AL RAZAK to at least engage in two personal visits with the undersigned before Respondents' relief is granted.

The fact that the circumstances of both AL RAZAK's and AL RAWI's confinement are unique is beyond dispute. It is indeed these special conditions which occasioned Judge Kollar-Kotelly to rule in (post-*Rasul*) *Al Odah v. United States*, 346 F. Supp. 2d 1, 8 (D.D.C. 2004) that Petitioners at Guantanamo have the right to assistance of counsel in pursuant to the federal *Habeas Corpus* statute. After noting their years of isolation and the circumstances of their capture, Judge Kollar-Kotelly wrote to say that they are "'seriously impaired' is an understatement...It is simply impossible to expect Petitioners to grapple with the complexities of a foreign legal system and present their claims to this Court without legal representation." While the Court was speaking of legal representation itself, it is submitted that the circumstances occasioning the Judge's conclusion have not changed. They over-shadow everything in this case.

IV.    Petitioner's Right to Invoke The Great Writ of Habeas
       Corpus, Whether Framed in Common Law, or
       Constitutional, or Statutory Terms, Transcends Procedural
       Formalities

Long before our Constitution was adopted, the common law protected against executive detention imposed without due process, and *Habeas Corpus* existed as a means to enforce the common law right to due process. As Justice

11

Scalia recently explained, common law protections against executive detentions,
recognized by Blackstone in his *Commentaries* [Vol. I, 122-32 (1705)] and our
Constitutional founders, were built upon two central ideas: "due process as the
right secured, and habeas corpus as the instrument by which due process could be
insisted upon." *Hamdi v. Rumsfeld*, 124 S. Ct. 2633, 2661 (2004) (Scalia, J.,
dissenting).

The original *habeas corpus* provision, found in 28 U.S.C. § 2241 (c)(1),
entitles anyone held "in custody under or by color of the authority of the United
States' to obtain judicial review of the legality of the detention. That provision
derives not from the Constitution, but from the common law. *Rasul v. Bush*, ___
U.S. ___, 124 S. Ct. 2686 at 2691-92.

As the Supreme Court pointed out in *Rasul*, the statutory entitlement to
judicial review of federal detentions is part of our common law heritage,
"throwing its root deep into the genius of our common law." 124 S. Ct. at 2692.
That provision was adopted in the first Judiciary Act enacted by the First
Congress in 1789 - prior even to the adoption of the Fifth Amendment and the Bill
of Rights. Section 2241 (c)(1) embodies the common law protection of individual
liberty - the right to independent judicial review of executive detention to ensure
that no person is deprived of liberty by authority of the federal government
without the protections of due process of law.

Habeas Corpus, as originally enacted in the Judiciary Act of 1789 and as it
exists under Section 2241 (c)(1) today, guarantees to every person detained under

federal authority to whom the writ extends the right to judicial review of the

legality of the detention. As Chief Justice Marshall explained in *Ex parte*

*Watkins*, 28 U.S. 193, 202 (1830):

> [H]abeas corpus is a high prerogative writ, known to the common law, the
> great object of which is the liberation of those who may be imprisoned without
> sufficient cause. It is in the nature of a writ of error, to examine the legality of the
> commitment.

On numerous occasions the Supreme Court has made it clear that the

weight of the Great Writ overwhelms procedural irregularities.

In *Frank v. Magnum*, 232 U.S. 309, 346-350 (1915) Justice Holmes,

dissenting, indicated his displeasure over the majority's adherence to procedural

regularity when the fairness of a criminal trial was at stake. The trial of the

defendant-Petitioner was occasioned by a display of extraordinary public

bitterness directed to the defendant. While his *Habeas* petition was procedurally

wanting, Justice Holmes opined that the Petition should have been entertained, as

protecting due process from the influence of mob rule was more important than

honoring procedural bars.

In *Harris v. Nelson*, 394 U.S. 286, 290-91 (1969), Justice Fortas wrote for

the Court:

> The writ of habeas corpus is the fundamental instrument for
> safeguarding individual freedom against arbitrary and lawless state
> action. Its pre-eminent role is recognized by the admonition in the
> Constitution that: "The Privilege of the Writ of Habeas Corpus
> shall not be suspended...." ...The scope and flexibility of the writ -
> its capacity to reach all manner of illegal detention - *its ability to
> cut through barriers of form and procedural mazes* - have always
> been emphasized and jealously guarded by courts and lawmakers.

13

The very nature of the writ demands that it be administered with
the initiative and flexibility essential to insure that miscarriages of
justice within its reach are surfaced and corrected.    (emphasis
added)

V.    Petitioner AL RAZAK and "Next Friend" AL RAWI
Acted According to Respondents' Own Directions

Respondents attached to their Motion for an Order to Show Cause, and

Petitioner attached to his opposition, a Declaration of Frank Sweigart, in which he

explains the "steps taken by the Department of Defense to notify detainees (at

Guantanamo) of their right to challenge the legality of their detention by filing

*habeas corpus* petitions in Federal Court." (Respondents' Motion, "Exhibit B;

Petitioner's Opposition, "Exhibit B"¶ 2)

Sweigart declares that in December, 2004, the Department of Defense

began to notify detainees of their post - *Rasul* right to file a petition.  He further

declares that "the notification tells the detainees that they have the option of

asking a friend, family member, or lawyer to file a petition on their behalf"

(emphasis added, ¶ 3) As the Petition of AL RAZAK plainly shows, this is

precisely what Petitioner did - - he asked a friend, in this case fellow detainee AL

RAWI, to obtain a lawyer to assert "any legal right he may have."  (See "Exhibit

A",  attached to the Petition.)

Attached to the Sweigart Declaration is a copy of the very "Notification"

which Mr. Sweigart declares was distributed to the Guantanamo detainees.  It

states, at paragraph 6:

> You may ask a civilian judge to look into the lawfulness of
> your detention through a process called a *petition for a writ of
> habeas corpus*. <u>You may ask a friend</u> or a family member or a
> lawyer to file such a petition with the court.  (underlining added)

As stated above, this is precisely what Petitioner AL RAZAK did.  It is to be

noted that the "Notification" did not require the inmate to "ask a friend whose

status is in accord with federal statutes or whose qualifications are consonant with

the *Whitmore* guidelines".  It offered legal recourse to a civilian court by asking a

friend or a lawyer to file a petition.

There is no principle of logic which dictates that since some detainees

filed through a "next friend" and others filed <u>pro se</u>, those who filed by the former

method have or should have any less legal legitimacy than those who filed by the

latter.  Both methods were advised or recommended by Respondents.  Nor does it

seem obligatory or necessary for Petitioner to "demonstrate" why he did not file a

petition *pro se*. (suggested in Respondents' Motion, p. 7).  Surely, neither method

is  privileged the over the other, nor can Petitioner's "failure" to file *pro se*

possibly substantiate a conclusion that he is any less desirous of challenging his

detention  (possibly for the remainder of his natural life) than those who filed by

other methods.  It stains the imagination to suppose that AL RAZAK, who

apparently speaks no English but only Pashtu, who may or may not be literate,

who likely does not know what *Habeas Corpus* means, who has no familiarity

with the American legal system and who has no knowledge how to file a paper in

Federal District Court could possibly proceed *pro se.*

Respondents are not only bound by the very procedures they offered to Guantanamo prisoners, but, until quite recently, Respondents have explicitly admitted the propriety of fellow detainees acting as legitimate "next friends" without regard to the fulfillment of the *Whitmore* guidelines. See Respondents' Motion to Dismiss in *John Does 1-570 v. Bush*, 05-CV-0313 (CKK) (D.D.C.) at pp 15-16. In that Motion, Respondents disputed an attempt by attorneys to pursue a petition for *Habeas Corpus* on behalf of 570 nameless inmates at Guantanamo and moved for dismissal, citing *Whitmore* for the principle that the attorneys had not been authorized by the nameless inmates and lacked a significant relationship with them. To distinguish and disparage this *John Doe* attempt at representation, Respondents pointed with approval to other cases which were properly filed. Respondents argued that the "vast majority of these detainees have filed petitions through other individuals acting as *legitimate next friends* - family members, an attorney who already represented the detainee in pending military commission proceedings, *and fellow detainees*." (Emphasis added). In this case, however, Respondents take the contrary, indeed contradictory, position and now seek to challenge that which they previously argued was proper method for a prisoner's right to obtain access to the court.

<u>CONCLUSION</u>

For all these reasons, or any one of them, the *Habeas Corpus* Petition should not be dismissed for lack of proper "next friend" standing.

16

Dated: Bearsville, New York
     9 November, 2005

Respectfully submitted,

Alan N. Sussman, Esq.
SUSSMAN OFFICE
Post Office Box 379
Bearsville, New York 12409
Tel/Fax: (845) 679-6927
Email: sussman@bard.edu

By:    _____
     ALAN N. SUSSMAN, ESQ.

*Of Counsel*
Barbara Olshansky (NY0057)
CENTER FOR CONSTITUTIONAL
RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
Tel: (212) 614-6439
Fax: (212) 614-6499

17

**Certificate of Service**

I hereby certify that a true and correct copy of the foregoing instrument has been served by Certified Mail, Return Receipt Requested, to the following persons:

Preeya Noronha, U.S. Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
Room 7144
20 Massachusetts Ave, NW
Washington, D.C. 20530

Alberto R. Gonzales
Attorney General of United States
U.S. Department of Justice
Robert F. Kennedy Building, Room 5111
Tenth Street & Constitution Ave, NW
Washington, D.C. 20530

On this the 9th day of November, 2005.

ALAN N. SUSSMAN, ESQ.

EXHIBIT   A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

----------------------------------------------------------------x

HAMID AL RAZAK,

                **Petitioner,**

-vs.-

                                            **05-CV 1601**
                                              **(GK)**

GEORGE W. BUSH,
        President of the United States, *et al.,*

                **Respondents.**

----------------------------------------------------------------x

## DECLARATION OF ALAN N. SUSSMAN

        Declarant, ALAN N. SUSSMAN, comes now upon penalty of perjury and declares that the following is true and correct to the best of his knowledge, recollection and belief:

        1.      I am an attorney duly licenced to practice law in the State of New York, the Northern and Southern Districts of New York, the Second Circuit Court of Appeals, and the Supreme Court of the United States.

        2.      I make this Declaration in support of Petitioner's Memorandum Showing  Cause why the Petition should not be dismissed for lack of "next friend" standing.

        3.      I am co-counsel with The Center for Constitutional Rights, 660 Broadway, New York, New York, in the representation of Petitioner, HAMID AL RAZAK.

        4.      On or about June, 2005, I telephoned the Center for Constitutional

Rights, a civil rights legal organization to which I have made financial contributions for years, especially since I learned of its pioneering work in seeking legal representation of the Guantanamo inmates, to volunteer my legal services in this endeavor.  I was informed that I could do so on a pro bono basis, to which I agreed, and I attended two information and training sessions in New York and Washington in July and August, 2005, for this purpose.  In August, 2005, I entered into a co-counsel agreement with the Center for Constitutional Rights (CCR) and was given a letter which inmate BISHER AL RAWI had given to CCR attorneys, who forwarded same to me, which is the letter attached to the Petition as "Exhibit A."

     5.     On August 13, 2005, I filed a Petition for a Writ of *Habeas Corpus* for Petitioner HAMID AL RAZAK, via the legal avenue of "Next Friend" BISHER AL RAWI, and attached his letter as "Exhibit A" to the said Petition.

     6.     Subsequent to filing the *Habeas* Petition for AL RAZAK, I contacted the Department of Justice for an application for security clearance to enable me to visit Guantanamo to visit personally with Petitioner.  Said application was completed and transmitted to the Department of Justice on August 30, 2005.  I recently have been interviewed by the F.B.I. in connection with this application, but to date I have not received clearance and thus am unable to visit Petitioner AL RAZAK in person at Guantanamo.  I am advised that proposed visits to Guantanamo require at least 20 day prior notice, thus making my first visit to personally interview my client improbable until December or January at best.

7.    No factual Return or Answer has been submitted by Respondents.

8.    No Protective Order has been entered in this case and I am unable at present to enter into attorney-client correspondence with Petitioner AL RAZAK.

9.    I am thus considerably handicapped in providing this Court with first-hand information about the personal desires of Petitioner AL RAZAK but, until then, for the foregoing reasons, I have no reason to doubt his desire for legal representation, expressed through the letter of this next friend, nor do I have any reason to doubt that the next friend does not have the actual legal interests of Petitioner in mind.

10.    I can and do promise this Court that, upon visits with my client, if he communicates his decision that I should not represent him, that no one should represent him, or that he desires other counsel than the undersigned, I will abide by that decision and communicate it to co-counsel and to this Court.

FURTHER DECLARANT SAYETH NOT.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 9 November, 2005

ALAN N. SUSSMAN

EXHIBIT   B

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

-------------------------------------------------------------------x

**HAMID AL RAZAK,**

**Petitioner,**

     **-vs.-**

**Civil Action
05-CV 1601
(GK)**

**GEORGE W. BUSH,**
     **President of the United States,** *et al.,*

**Respondents.**

-------------------------------------------------------------------x

## DECLARATION BY ATTORNEY BARBARA OLSHANSKY

I, Barbara Olshansky, declare that the following statements are true to the best of my knowledge, information, and belief:

     1.    I am a member in good standing of the bar of this Court and have practiced law for 18 years.   I am also an attorney in good standing in the State of New York.

     2.    For the last three years, I have been actively involved in the steps that my office, the Center for Constitutional Rights (CCR), has taken to (1) advance the rights of the Guantanamo detainees through litigation establishing their right to file petitions for writs of *habeas corpus* in federal court; (2) work with other non-profit organizations to reach out to the family members of the Guantanamo detainees for the purpose of filing next-friend petitions for writs of *habeas corpus*; and (3) recruit and train private attorneys to represent individual Guantanamo detainees on a *pro bono* basis.

3.      CCR has engaged in extensive litigation, advocacy and public education on behalf of the individuals detained at Guantanamo Bay, including, most importantly, *Habib v. Bush & Rasul v. Bush*. In February and May of 2002 CCR filed *habeas corpus* petitions challenging the U.S. government's practice of holding foreign nationals in indefinite detention at Guantanamo without access to the courts or the right to know the charges against them. CCR filed the petitions on behalf of two Australian citizens, David Hicks and Mamdouh Habib, and two men from the United Kingdom, Shafiq Rasul and Asif Iqbal. The petitions challenged respondents' indefinite detention of petitioners without due process of law, in violation of the U.S. Constitution and other federal laws, the Geneva Conventions, and international humanitarian and human rights law. CCR and its co-counsel litigated the case before the District Court, the D.C. Circuit Court of Appeals, and the United State Supreme Court. On June 28, 2004, the Supreme Court held that the detainees have the right of access to U.S. courts to challenge their detention under 28 U.S.C. §2241. *Rasul v. Bush,* 124 S. Ct. 2686, 2698 (2004).

4.      Responding to the Supreme Court's historic decision upholding the rule of law at Guantanamo, CCR has spearheaded the effort to get each detainee his day in court. Since the Supreme Court decision, CCR and its partners have arranged for private law firms to represent detainees and file *habeas corpus* petitions on a pro bono basis in this Court. Through these efforts, more than 200 detainees currently have *habeas corpus* petitions pending in this Court.

5.      Because the U.S. government has refused to provide CCR or any

other organization or attorney access to the Guantanamo detainees in any manner that would facilitate providing them advice regarding their right to file a habeas petition and the availability of pro bono counsel to represent them, each of the petitions currently on file with this Court was made possible through one of two means: (I) requests by the family members or loved ones of those detained for legal assistance from CCR or from other human rights organizations or counsel with whom CCR is working; or (ii) requests made through certain detainees (who are represented by counsel) acting as next friends for other detainees who have expressed their desire to retain counsel and file habeas petitions.

6.      More specifically, CCR and its partner organizations received authorizations from next friends through outreach activities which included, among other things, taking part in human rights conferences around the world, contacting international human rights organizations, and searching for family members of know detainees.  In addition, advocates working with CCR made numerous outreach efforts to member countries of the European Parliament seeking their assistance in locating their citizens.  Despite these efforts, CCR and its partners have not been able to identify next friends for the vast majority of Guantanamo detainees.

7.      CCR and its partners have used the information they have obtained to date to match detainees with private law firms willing to represent detainees on a *pro bono* basis and file *habeas corpus* petitions on the detainees' behalf.

8.      However, despite the work of CCR and its *pro bono* partners, the vast majority of detainees at Guantanamo - upon information and belief,

approximately 300 - remain unrepresented for the simple reason that the United States Government has held them virtually incommunicado and in physical isolation.

9.    The Government's refusal to disclose the names of the Petitioners, to provide the Petitioners with meaningful notice of their rights, and to permit CCR or any similar organization to communicate with them regarding these rights has prevented the Petitioners from being able to access and obtain counsel to do what the Supreme Court said they have a right to do - file *habeas* petitions challenging the legality of their detention.

10.    In addition to its own efforts as described above, CCR has also tried to work with the United States Government to ensure that every detainee at Guantanamo is able to take advantage of his right to file a *habeas corpus* petition, as affirmed by the U.S. Supreme Court in *Rasul v. Bush*.

11.    Despite a number of good faith efforts to negotiate with Respondents, CCR has been denied any opportunity to communicate with the detainees at Guantanamo to advise them of their rights, and assist them in retaining counsel.

I declare, under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this 31st day of October, 2005, New York, New York.

_____
Barbara Olshansky (NY0057)

EXHIBIT   C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

-----------------------------------------------------------x

HAMID AL RAZAK,

        Petitioner,

-vs.-                                   05-CV 1601
                                              (GK)

GEORGE W. BUSH,
      President of the United States, *et al.*,

        Respondents.

-----------------------------------------------------------x

## DECLARATION OF GEORGE BRENT MICKUM IV

George Brent Mickum IV declares, under penalty of perjury:

1.    I am a partner at the law firm of Keller and Heckman LLP, located at 1001 G Street, N.W., Suite 500 West, Washington, D.C. 20001.

2.    I, and my partner and co-counsel, Douglas J. Behr, represent Jamil El-Banna, Bisher Al-Rawi, and Martin Mubanga, petitioners in other similar and related cases.  Mr. Mubanga formerly was imprisoned there.  Jamil El-Banna and Bisher Al-Rawi remain imprisoned at the Guantanamo Bay Naval Station.

3.    As part of this firm's and the Center for Constitutional Rights' continuing efforts to secure representation for all prisoners at Guantanamo, we specifically asked our clients to provide us with the names of prisoners who have expressed the desire for legal representation.

4.    Bisher Al-Rawi has provided me directly with the names of twenty-five to

thirty prisoners who have requested representation. Based on this information, all prisoners so identified have been provided with counsel.

5. Through communication with Bisher Al-Rawi, and Clive Statford-Smith, who also serves as co-counsel with me in the representation of Mr. Al-Rawi and visits Guantanamo with greater frequency than I, it came to our attention that petitioner in the above-named matter, Hamid Al-Razak, wanted legal representation to pursue legal remedies against respondents.

6. As with other information, we forwarded his name to the Center for Constitutional Rights after the correspondence was reviewed and unclassified by the government's Privilege Team.

7. With our approval, the Center for Constitutional Rights assigned this case to counsel whose name and signature appear on the petition filed in this case.

8. Bisher Al-Rawi speaks and writes English. He is a true friend to the prisoners whose names he has forwarded. This is especially so with regard to those prisoners who do not have command of English. I have discussed with him the legal concept of "next friend" and he is aware that a "next friend" is needed for another prisoner to commence a petition for a writ of habeas corpus.

9. On at least one occasion, Bisher Al-Rawi was placed in solitary confinement by the military authorities at Guantanamo for a lengthy period of time without comfort items, including toilet paper, clothes, toothbrush and towel, among other items, for possessing a list with the names of

prisoners who wanted legal representation. How many friends would spend time in solitary confinement in degrading conditions for this purpose? Those prisoners seeking legal representation may have no truer friend than Mr. Al-Rawi.

10. The government has notified prisoners at Guantanamo that they may seek relief in a civilian court by asking a friend to act on their behalf. This is apparently what petitioner Al-Razak has done, through the assistance and generosity of my client, Bisher Al-Rawi.

11. If prisoner Al-Razak had no friends he would likely have no recourse to civilian courts whatsoever, notwithstanding the Supreme Court's decision in *Rasul*. It is his good fortune to have found a friend in the person of my client, Bisher Al-Rawi, who assisted Mr. Al-Razak to find legal representation for him.

I declare under penalty of perjury that the foregoing is true and correct. Executed on November 3, 2005 in Washington, D.C.

George Brent Mickum IV, Bar No. 396142
KELLER AND HECKMAN LLP
1001 G Street, N.W., Ste. 500W
Washington, D.C. 20001
(202) 434-4100
(202) 434-4646 (fax)