UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HAMID AL RAZAK, )<br>        Petitioner, )<br>)<br>    v. )<br>)<br>BARACK H. OBAMA, et al., )<br>        Respondents )<br>) | Case No. 1:05-cv-1601 (GK) |

## MEMORANDUM OPINION

Petitioner Haji Hamdullah[1] has been detained as a prisoner of war by the United States since his capture in 2003. Mr. Hamdullah argues that active hostilities in Afghanistan have ceased and that the United States is therefore obligated under the Third Geneva Convention to release him immediately. Respondents counter that the Authorization for Use of Military Force continues to authorize Mr. Hamdullah's detention because the United States remains engaged in active hostilities in Afghanistan.

This matter is before the Court on Petitioner's Motion to Grant Petition for Writ of Habeas Corpus ("Motion") [Dkt. No. 301]. Upon consideration of Petitioner's Motion, Respondents' Opposition ("Opp'n") [Dkt. No. 306], Petitioner's Reply ("Reply") [Dkt. No. 308], and the entire record herein, and for the reasons set forth below, Petitioner's Motion shall be **denied**.

---

[1] The name on the docket--Hamid Al Razak--is a result of an error on the initial habeas filing, and Petitioner asserts that his correct name is Haji Hamdullah. Mot. at 1 n. 1.

- 1 -

I.  BACKGROUND

A.  Mr. Hamdullah

Mr. Hamdullah is an Afghan citizen who was captured by Afghan National Army forces in July 2003 in Afghanistan. Mot. at 2; Opp'n at 3. He was subsequently transferred to the custody of the United States and detained at Naval Station Guantánamo Bay. Mot. at 2; Opp'n at 3. He has been detained at Guantánamo Bay for over 11 years. Mot. at 2-3.

Mr. Hamdullah filed a petition for a writ of habeas corpus in 2005, challenging the legality of his detention. See Petition for Writ of Habeas Corpus [Dkt. No. 1]. A Combatant Status Review Tribunal determined in 2006 that Mr. Hamdullah was properly designated as an enemy combatant because of his alleged affiliation with Hezb-e-Islami Gulbuddin ("HIG"). See Review of Combatant Status Review Tribunal for Detainee ISN #1119 [Dkt. No. 42-1].

On October 8, 2015, Petitioner filed the present Motion. Respondents filed their Opposition on December 14, 2015, and Petitioner filed his Reply on January 8, 2016. Respondents filed a Notice of Supplemental Authority on March 1, 2016 [Dkt. No. 309]. Petitioner similarly filed a Notice of Supplemental Authority on March 11, 2016 [Dkt. No. 310], and Respondents filed a Response to Petitioner's Notice of Supplemental Authority on March 16, 2016 [Dkt. No. 311].

B.  **The War in Afghanistan**

In the immediate aftermath of the attacks of September 11, 2001, Congress passed the Authorization for the Use of Military Force ("AUMF"). Pub. L. No. 107-40, 115 Stat 224 (2001). In <u>Hamdi v. Rumsfeld</u>, a plurality of the Supreme Court ruled that Congress's "grant of authority for the use of 'necessary and appropriate force'" in the AUMF "include[s] the authority to detain [prisoners of war] for the duration of the relevant conflict." <u>Hamdi</u>, 542 U.S. 507, 521 (2004) (plurality opinion); <u>see also</u> <u>Aamer v. Obama</u>, 742 F.3d 1023, 1041 (D.C. Cir. 2014) ("[T]his court has repeatedly held that under the [AUMF], individuals may be detained at Guantánamo so long as they are determined to have been part of Al Qaeda, the Taliban, or associated forces, and so long as hostilities are ongoing.").

Beginning in October 2001, U.S. and coalition forces began a military campaign in Afghanistan that consisted of air, land, and sea forces. Opp'n at 5 (<u>citing</u> National Commission on Terrorist Attacks Upon the United States, The 9/11 Commission Report at 337-38 (2004)). The military campaign drove the Taliban from control over much of Afghanistan by December 2001, "but Taliban, al-Qa'ida, and associated forces continued to operate and conduct attacks in Afghanistan." <u>Id.</u> From 2001 until the end of 2014, the United States led a large-scale combat mission in Afghanistan known as Operation Enduring Freedom. <u>Id.</u> (<u>citing</u> Opp'n Ex. 4, Statement by

Secretary of Defense Chuck Hagel on Operation Enduring Freedom and Operation Freedom's Sentinel at 1 (Dec. 28, 2014) ("Hagel Statement") [Dkt. No. 306-2]).

Secretary Hagel stated that the close of 2014 would bring to an end the "combat mission in Afghanistan." Id. The follow-up mission, known as Operation Freedom's Sentinel, began in 2015. Operation Freedom's Sentinel has two purposes: (1) to work with allies and partners "to continue training, advising, and assisting Afghan security forces," and (2) to continue the United States' "counterterrorism mission against the remnants of Al-Qaeda to ensure that Afghanistan is never again used to stage attacks against our homeland." Id.

President Obama made similar remarks in a May 2014 speech regarding the end of the combat mission and the Afghan people's assumption of responsibility for securing their country. Mot. Ex. 8, President Barack Obama, Statement by the President on Afghanistan (May 27, 2014) [Dkt. No. 301-4]. He stated that the United States would "bring America's longest war to a responsible end," in 2014, noting that the number of American troops in Afghanistan would be under 10,000 by the beginning of 2015, down from 180,000 when he took office. Id. at 1, 3. He continued, "this is how wars end in the 21st century--not through signing ceremonies, but through decisive blows against our adversaries, transitions to elected governments, security forces who take the lead and

ultimately full responsibility." Id. at 3. In his January 20, 2015 State of the Union address, President Obama reiterated his statement that the "combat mission in Afghanistan is over." Mot. Ex. 11, President Barack Obama, State of the Union Address (Jan. 20, 2015) [Dkt. No. 301-4].

On September 30, 2014, the United States and Afghanistan executed a Bilateral Security Agreement. See Mot. at 6-7 (citing Ex. 2, Security and Defense Cooperation Agreement between the Islamic Republic of Afghanistan and the United States of America ("Bilateral Security Agreement") [Dkt. No. 301-4]). The Bilateral Security Agreement's stated purpose is to foster close cooperation between the United States and Afghanistan to "strengthen security and stability in Afghanistan, counter terrorism, contribute to regional and international peace and stability, and enhance the ability of Afghanistan to deter [threats against it]." Bilateral Security Agreement, art. 2 ¶ 1. The Agreement denies the United States the ability to conduct combat operations in Afghanistan without Afghanistan's agreement, and lays out the United States' role in undertaking "supporting activities." Id. art. 2 ¶ 2.

II. **LEGAL STANDARD**

    A. **AUMF Detention**

Per the terms of the AUMF, the President

> is authorized to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the

terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.

Pub. L. No. 107-40, §2(a).

The AUMF sets no expiration date and is in fact silent on the issue of when or how it expires. The Supreme Court and Congress however have both provided guidance on the duration of the AUMF. As discussed above, a plurality of the Supreme Court in <u>Hamdi</u> held that the AUMF granted the President the authority to detain "for the duration of the relevant conflict." 542 U.S. at 521. In the National Defense Authorization Act for Fiscal Year 2012 ("NDAA"), Congress reaffirmed the provisions of the AUMF and the President's authority to detain covered persons "until the end of hostilities." Pub. L. No. 112-81, § 1021(c)(1), 125 Stat. 1298, 1562 (2011). In 2014, our Court of Appeals also reaffirmed that under the AUMF, "individuals may be detained at Guantánamo so long as they are determined to have been part of Al Qaeda, the Taliban, or associated forces, and so long as hostilities are ongoing." <u>Aamer</u>, 742 F.3d at 1041.

    **B.   Geneva Convention**

The Third Geneva Convention was ratified as a treaty by Congress and the President in 1955. <u>See</u> Geneva Convention (III) Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 6

U.S.T. 3316, 75 U.N.T.S. 135 ("Third Geneva Convention"). The first paragraph of Article 118 of the Third Geneva Convention requires that a prisoner of war be released "without delay after the cessation of active hostilities." Id. art. 118. While Article 118 does not explicitly define "cessation of active hostilities," the second paragraph does contemplate that cessation of active hostilities might not always be reached through a formal agreement or peace treaty. Id. ("In the absence of stipulations [regarding release] in any agreement concluded between the Parties to the conflict with a view to the cessation of hostilities, or failing any such agreement, each of the Detaining Powers shall itself establish and execute without delay a plan of repatriation in conformity with the principle laid down in the foregoing paragraph.")

C.   Judicial Review

Petitioner's Petition raises two issues: whether "active hostilities" are considered to have ended, and who makes that determination. Both parties appear to agree that the Court should rely on the President's decision, but differ as to how to interpret President Obama's position. Petitioner relies on speeches made by the President declaring an end to combat operations in Afghanistan, Mot. at 21-22, while Respondents rely on the assertions by individuals in the

political branches that active hostilities continue. Opp'n at 31-32.

While entitled to some deference, the President's position is not dispositive. Our Court of Appeals has stated that, under separation of powers principles, "[t]he determination of when hostilities have ceased is a political decision, and we defer to the Executive's opinion on that matter, at least in the absence of an authoritative congressional declaration purporting to terminate the war." Al Bihani v. Obama, 590 F.3d 866, 874 (D.C. Cir. 2010) (citing Ludecke v. Watkins, 335 U.S. 160, 168-70 & n.13 (1948)). But, the Hamdi plurality recognized that deference to the Executive must have limits. Hamdi, 542 U.S. at 530 ("history and common sense teach us that an unchecked system of detention carries the potential to become a means for oppression and abuse of others who do not present [an immediate threat to national security]").

As Judge Lamberth noted in Al Warafi v. Obama,[2] the Hamdi Court held that the AUMF's detention authorization turns

---

[2] On March 4, 2016, the United States Court of Appeals for the District of Columbia vacated Judge Lamberth's opinion and order in Al Warafi and remanded with instructions to dismiss the case as moot. Al-Wrafie v. Obama, No. 15-5266. The case was mooted by the petitioner's subsequent transfer from the United States' custody. Despite this, the case remains "on the books" and retains its persuasive value. See Nat'l Black Police Ass'n v. District of

partly on whether "the record establishes that United States troops are still involved in active combat in Afghanistan." Al Warafi v. Obama, No. 09-CV-2368, 2015 WL 4600420 at *3 (D.D.C. July 30, 2015) (emphasis added in Al Warafi) (quoting Hamdi, 542 U.S. at 521). As Judge Lamberth indicated, a "record" implies review by a court, and suggests that Hamdi stands for the proposition that a court can and must examine the issue of whether active combat continues. Id.

The Court need not fully address Respondents' separation of powers argument at this time because the Court finds that the President has not declared the end of active hostilities and because the Court agrees with Respondents' position that active hostilities continue in Afghanistan.

D.   **Standard of Review**

The Government bears the burden of proving by a preponderance of the evidence that Mr. Hamdullah is lawfully detained. See In re Guantánamo Bay Detainee Litig., Misc. No. 08-442, CMO § II.A (Nov. 6, 2008) ("The government bears the burden of proving by a preponderance of the evidence that the petitioner's detention is lawful.") (citing Boumediene v. Bush, 553 U.S. 723, 787 (2008) ("The extent of the showing required of the Government in these cases is a matter to be determined.")). The D.C. Circuit has

---

Columbia, 108 F.3d 346, 354 (D.C. Cir. 1997); Rabbani v. Obama, 76 F. Supp. 3d 21, 24-25 n.3 (D.D.C. 2014).

affirmed that "a preponderance of the evidence standard is constitutional in evaluating a habeas petition from a detainee held at Guantánamo Bay, Cuba." Awad v. Obama, 608 F.3d 1, 10 (D.C. Cir. 2010); see also Al Odah v. United States, 611 F.3d 8, 13 (D.C. Cir. 2010), cert. denied 131 S. Ct. 1812 (2011) ("It is now well-settled law that a preponderance of the evidence standard is constitutional in considering a habeas petition from an individual detained pursuant to authority granted by the AUMF."). Accordingly, the burden of proof remains with the Government.

## III. ANALYSIS

### A. Cessation of Active Hostilities

The crux of the Parties' disagreement is whether detention is authorized for the duration of "active combat" or "active hostilities." Compare Hamdi, 542 U.S. at 521 ("If the record establishes that United States troops are still involved in active combat in Afghanistan, those detentions are part of the exercise of 'necessary and appropriate force' . . .") with Hamdi, 542 U.S. at 520 ("It is a clearly established principle of the law of war that detention may last no longer than active hostilities."); see also Third Geneva Convention, Art. 118 (prisoners of war must be released "after the cessation of active hostilities").

The "cessation of active hostilities" standard was first adopted in the 1949 Geneva Conventions following the delayed repatriation of prisoners of war in earlier armed conflicts. See

3 Int'l Comm. of Red Cross, Commentary: Geneva Convention Relative to the Treatment of Prisoners of War, 541-43 (J. Pictet gen. ed. 1960) ("Third Convention Commentary").

The two predecessor multilateral law-of-war treaties to the 1949 Geneva Conventions required repatriation of prisoners of war only "after the conclusion of peace." See id. at 541. Repatriation delays arose after World Wars I and II due to a substantial gap in time between the cessation of active hostilities and the signing of formal peace treaties. Id. The "cessation of active hostilities" requirement sought to correct this problem, thereby making repatriation no longer contingent on a formal peace accord or political agreement between the combatants. Id. at 540, 543, 546-47.

In light of this history, Petitioner correctly interprets the Third Geneva Convention's "cessation of active hostilities" so that final peace treaties are no longer a prerequisite to mandatory release of prisoners of war. Based on that change, Petitioner argues that the Third Geneva Convention contemplates the possibility that some degree of conflict might continue even after the core of the fighting has subsided. Mot. at 11.

Petitioner argues that cessation of active hostilities requires only an end to active combat. Mot. at 13. Petitioner reaches this conclusion by comparing the language of the Third Geneva Convention with language in Articles 6 and 133 of the Fourth

Geneva Convention. See Mot. at 13, 15-17 (citing Geneva Convention (IV) Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287 ("Fourth Geneva Convention")).

Article 133 of the Fourth Geneva Convention addresses the internment of civilians in wartime and provides that such internment "shall cease as soon as possible after the close of hostilities." Fourth Geneva Convention art. 133. Relying on the Fourth Convention's Commentary, Petitioner attempts to show that "close of hostilities" could be a point in time that might occur after "cessation of active hostilities."

The Court is not convinced. Indeed, the Commentary Petitioner cites acknowledges that the provisions are similar and "should be understood in the same sense." 4 Int'l Comm. of Red Cross, Commentary: Geneva Convention Relative to the Protection of Civilian Persons in Time of War, 514-15 (J. Pictet gen. ed. 1960) ("Fourth Convention Commentary").

Petitioner also looks to Article 6 of the Fourth Geneva Convention, which states that application of the Fourth Geneva Convention "shall cease on the close of military operations." Fourth Geneva Convention, art. 6. The phrase "close of military operations" was understood to mean "the final end of all fighting

between all those concerned."[3] Fourth Convention Commentary at 62. The Court agrees with Petitioner that "cessation of active hostilities" is distinct from "close of military operations," and that active hostilities can cease prior to the close of military operations.

This distinction is consistent with the differing purposes of Article 6 (defining the period of time in which the Fourth Geneva Convention, in its entirety, applies) and Article 118 (focusing on detention specifically). But, it does not necessarily follow that "cessation of active hostilities" therefore requires only an end to combat operations, as Petitioner argues. See Mot. at 17.

For the foregoing reasons, the Court concludes that the appropriate standard is cessation of active hostilities and that active hostilities can continue after combat operations have ceased. But, cessation of active hostilities is not so demanding a standard that it requires total peace, signed peace agreements, or an end to all fighting.

### B.   Mr. Hamdullah's Detention Under the AUMF

Next, the Court looks to whether active hostilities have, in fact, ceased. Petitioner relies heavily on the Bilateral Security Agreement and the President's speeches regarding the end of the

---

[3] The main purpose of this statement was to clarify that if more than two nations are involved in a conflict, the Fourth Convention only ceases to apply after the fighting stops between all parties, not just some of the parties. Fourth Convention Commentary at 62.

combat mission and war in Afghanistan in support of his argument that active hostilities have ceased.

Petitioner relies on the Bilateral Security Agreement's requirement that the United States receive consent from the Afghan government prior to conducting combat operations in Afghanistan as evidence that combat operations have ceased. See Mot. at 7. Even assuming this to be true, the Court has already determined that "active hostilities" are not the same as "combat operations. See supra, Section III.A. The Bilateral Security Agreement is not evidence that active hostilities have ceased. Respondents add that although the United States has ended its combat mission in Afghanistan, this shift does not mark the end of active hostilities in Afghanistan, and indeed, fighting still continues. Opp'n at 8-11.

Petitioner cites to speeches by the President, including his 2015 State of the Union Address and his May 2014 Statement on Afghanistan, but notably, none of these statements discuss the end of "active hostilities." See supra, 4-5. The end of the combat mission is not synonymous with the end of active hostilities. See supra, Section III.A. Indeed, the President has expressly stated that active hostilities continue. See, e.g., Mot. Ex. 13, Letter from the President: Six Month Consolidated War Powers Resolution Report (June 11, 2015) [Dkt. No. 301-4] (emphasis added) ("The United States currently remains in an armed conflict against al-

Qa'ida, the Taliban, and associated forces, and <u>active hostilities against those groups remain ongoing</u>.").

Petitioners point to greatly reduced troop numbers in Afghanistan as evidence of cessation of active hostilities. Respondents counter that the continued presence of nearly 10,000 U.S. troops in Afghanistan is actually evidence of ongoing active hostilities. Mot. at 19, 21; Opp'n at 16. While troop numbers alone are not sufficient to determine whether active hostilities persist, see Mot. at 22, a United States presence of nearly 10,000 troops certainly supports the conclusion that ongoing active hostilities exist.

Respondents provide numerous examples of ongoing conflict in Afghanistan and instances of hostile forces engaging U.S. personnel. See Opp'n at 16-18. In 2015, there were over 360 "close air support missions carried out by the United States in Afghanistan involving the release of at least one weapon." Id. at 16. Coalition forces conducted air strikes in southern Afghanistan that destroyed a large al-Qaeda training camp and U.S. armed forces continue to participate in certain ground operations. Id. at 17.

"The Geneva Conventions require release and repatriation only at the 'cessation of active hostilities.'" Al-Bihani, 590 F.3d at 874 (citing Third Geneva Convention art. 118). As this Court has noted, "The Supreme Court and the D.C. Circuit have repeatedly held that detention under the AUMF is lawful for the duration of

active hostilities." <u>Al Odah v. United States</u>, 62 F. Supp. 3d 101, 114 (D.D.C. 2014). While what constitutes "active hostilities" has never been clearly defined, Respondents have provided convincing examples of ongoing hostilities in Afghanistan. Given this evidence, combined with the deference accorded the Executive's determination of when hostilities have ceased, the Court concludes that active hostilities continue in Afghanistan. Mr. Hamdullah's continued detention, therefore, is both authorized under the AUMF and does not violate the Third Geneva Convention.

## IV.   CONCLUSION

For the foregoing reasons, Petitioner's Motion to Grant Petition for Writ of Habeas Corpus shall be **denied**. An Order shall accompany this Memorandum Opinion.

March 29, 2016

/s/ Gladys Kessler
Gladys Kessler
United States District Judge

**Copies to:** attorneys on record via ECF